QUALITY TRANSPORT SERVICES, INC., Plaintiff,

v.

The UNITED STATES, Defendant,

and

M.R.W. International, Inc., and Zenith Van & Storage, Inc., Intervenors/Defendants.

No. 165–87C.

United States Claims Court.

April 28, 1987.

## OPINION

NETTESHEIM, Judge.

This pre-contract award action was commenced by plaintiff Quality Transport Services, Inc. ("plaintiff"), to enjoin award of a small business set-aside contract to the joint venture of intervenors/defendants M.R.W. International, Inc., and Zenith Van & Storage, Inc. (the "joint venture"). Defendant agreed to withhold contract award until the matter could be resolved on briefs. The parties, other than the joint venture which did not appear, were heard after the completion of briefing. The issue is whether the contracting officer abused his discretion or violated applicable regulations in determining to award a military "pack-and-crate" contract involving interstate carriage to a joint venture that does not hold in its own name motor carrier authority from the Interstate Commerce Commission (the "ICC"), although one co-venturer has ICC operating authority.

## FACTS

The following facts are undisputed. The subject solicitation for a one-year contract, with option to extend, called for packing, crating, unpacking, uncrating, and drayage of shipments of used household goods for the Department of the Army's Cameron Station, Alexandria, Virginia. Plaintiff is the incumbent contractor. Separate bidding was required for specified geographic areas. Area II, which is involved in this case, includes cities and counties in metropolitan Virginia adjacent to Washington, D.C., as well as Dulles International and Washington National Airports. Pickup and shipment extended to points within 100 miles of Area II and delivery to points within 300 miles thereof. Although pickup and delivery within the Washington, D.C. commercial zone are not considered movements in interstate commerce, the parties agree that the solicitation does call for some service in interstate commerce.

The solicitation included a clause mandated by 48 C.F.R. § 47.207–1(a) (1986) (Federal Acquisition Regulation, or "FAR"). Section 47.207–1, entitled "Qualifications of offerors," provides:

Alan F. Wohlstetter, Washington, D.C., for plaintiff. Stanley I. Goldman, Denning & Wohlstetter, of counsel.

Joseph A. Kijewski, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant.

Paul G. Dembling, Washington, D.C., for intervenors/defendants. Dennis A. Adelson, Schnader, Harrison, Segal & Lewis, of counsel.

(a) *Operating authorities.* The contracting officer shall insert the clause at 52.247–2, Permits, Authorities, or Franchises, when regulated transportation is involved. The clause need not be used when a Federal office move is intrastate and the contracting officer determines that it is in the Government's interest not to apply the requirement for holding or obtaining State authority to operate within the State.

FAR § 52.247–2, entitled "Permits, Authorities, or Franchises," provides:

As prescribed in 47.207–1(a), insert the following clause in solicitations and contracts for transportation or for transportation-related services when regulated transportation is involved. The clause need not be used when a Federal office move is intrastate and the contracting officer determines that it is in the Government's interest not to apply the requirement for holding or obtaining State authority to operate within the State.

. . . .

(a) The offeror certifies that the offeror does /___/, does not /___/, hold authorization from the Interstate Commerce Commission or other cognizant regulatory body. If authorization is held, it is as follows:

_____
(Name of regulatory body)

_____
(Authorization No.)

(b) The offeror shall furnish to the Government, if requested, copies of the authorization before moving the material under any contract awarded. In addition, the offeror shall, at the offeror's expense, obtain and maintain any permits, franchises, licenses, and other authorities issued by State and local governments.

In its bid plaintiff certified that it holds operating authority to transport household goods in interstate and foreign commerce. In its bid the joint venture indicated that each of the entities held intra-Virginia motor carrier authority issued by the Virginia State Corporation Commission. Zenith Van & Storage, Inc. ("Zenith"), however, holds authority to move freight in interstate commerce, although the joint venture's bid did not so indicate. Apparently, the contracting officer obtained this information from another source.

Before this court the joint venture took the position that it was not a legal entity (a proposition contested by defendant) and that the arrangement was the product of a verbal agreement that would be implemented if the joint venture were awarded the contract. The joint venture explained: "[T]wo carriers are jointly bidding, with an arrangement between them that provides for each to perform only the carriage for which it has authority in its own name...." Joint Venture's Br. filed Apr. 10, 1987, at 10. An affidavit submitted in this proceeding by officers of M.R.W. International, Inc., and Zenith states:

When the Army's Military District of Washington issued IFB No. DAHC30–87–B–0008 for pack-and-crate services, MRW and Zenith each made an assessment of their ability to bid on and obtain a contract for one or more of the geographic areas covered. A review of the Solicitation convinced each of us to pool our resources with another company in order to respond to this Solicitation. The officers of our two companies met and orally agreed to bid jointly on this Solicitation and to perform jointly any contracts we might receive from this Solicitation. We viewed the arrangement as a joint venture of two independent companies, and did not intend to create any new entity as such. The arrangement is limited solely to this procurement.

Joint Affidavit of Melvin D. Bailey and Alban J. Zolly, Apr. 17, 1987, ¶ 3.[1]

---

**1.** Plaintiff questions the joint venture's *bona fides,* because the co-venturers listed only their intrastate authority in their December 15, 1986 bid; Zenith did not list its ICC number; and the affiants claim that only on December 13 did they formulate their bidding strategy to pool their resources, including Zenith's ICC operating authority. *See* Bailey & Zolly Aff. ¶¶ 4–5. The suggestion seems to be that the joint venture is rationalizing. The court deems this contention

The joint venture submitted a bid for $450,975, and plaintiff's bid was for $551,325.

On December 16, 1986, plaintiff protested to the contracting officer that the joint venture was not responsible because it did not hold the required ICC motor carrier authority to transport shipments in interstate or foreign commerce. The contracting officer denied the protest by letter of December 31, 1986, reasoning:

MDW, DCSACQ [Military District of Washington, Deputy Chief of Staff for Acquisitions] contacted the International [sic] Commerce Commission ... on 29 December, 1986 and was advised that the Virginia State Corporation Commission Certification held by both M.R.W. and Zenith is the proper authority to do intrastate business. In the event that services would be required on an interstate level, Zenith Van & Storage Co., Inc. possesses ICC authority based on a telephone conversation with Zenith on 17 December, 1986. ICC stated it was generally common and acceptable practice among business relationships similar to M.R.W.'s and Zenith's for one company to possess an ICC authority while the other does not.

Therefore, the Contracting Officer has made the determination that the bid submitted by M.R.W. International, Inc. and Zenith Van & Storage Co., Inc. is responsive. ...

The decision reflects the substance of a telephone conversation of the contracting officer's subordinate with the ICC employee.

After the contracting officer denied plaintiff's protest, a protest was lodged with the General Accounting Office (the "GAO") on January 7, 1987, as supplemented on January 9, 1987. Plaintiff again argued that the joint venture was not a responsible bidder because it did not hold ICC authority in its own name, as the solicitation required. Plaintiff took the position

that the contracting officer's decision that the joint venture held ICC authority in its own name on the basis of the authority held individually by Zenith was wrong, because the authority must be held in the name of the joint venture in order to satisfy the terms of the solicitation and the requirements of the ICC. Plaintiff also argued that the ICC's informal opinion that was the basis of the contracting officer's decision was incorrect and not binding on the ICC.

Plaintiff filed on January 12, 1987, its petition with the ICC for a declaratory order that a joint venture must hold ICC authority in its own name. The petition was docketed by the ICC on February 10, 1987, as *Quality Transport Serv., Inc.,* No. MC–C–30031—Petition for a Declaratory Order.

On March 26, 1987, the GAO dismissed plaintiff's protest. The Comptroller General took the position that the GAO does not review affirmative determinations of responsibility absent a showing of fraud or bad faith on the part of procuring officials or an alleged failure by the agency to apply definitive responsibility criteria. The GAO concluded that FAR § 52.247–2 "is simply a listing requirement, to aid the contracting officer in determining responsibility, and not a definitive responsibility criterion...." *Quality Transport Serv., Inc.,* Comp.Gen. B–225611, at 3–4 (Mar. 26, 1987). Plaintiff's application for a temporary restraining order followed. The joint venture intervened, and defendant moved for summary judgment in its favor on the merits.

## DISCUSSION

1. Unfortunately, the court's resolution of the question of law presented has been hampered by the ICC. On March 27, 1987, the date on which plaintiff initiated its action in this court, the court issued a call order on the ICC

to render a decision upon the petition for declaratory order filed on January 12,

---

speculative. The bid discloses that the joint venture was the bidding entity and listed the intrastate authority of each co-venturer. The contracting officer was not prevented from

ascertaining from sources beyond the bid document whether the interstate authority also was held.

1987, by Quality Transport Services, Inc., and to file with the Clerk of the Court, by or before the close of business on April 3, 1987, an original and three copies of such decision.

The authority underlying this order is set forth in 28 U.S.C. § 2507(a) (1982), which provides in full:

The United States Claims Court may call upon any department or agency of the United States or upon any party for any information or papers, not privileged, for purposes of discovery or for use as evidence. The head of any department or agency may refuse to comply with a call issued pursuant to this subsection when, in his opinion, compliance will be injurious to the public interest.

RUSCC 34(d)(1) sets forth procedures implementing this statutory authority. Pursuant to court rule, on March 27, 1987, the Clerk of the Court served a formal call on the ICC. On April 2, 1987, after a desultory telephone call from one of the ICC staff attorneys explaining to the court's law clerk why the ICC would not be able to respond to the order (including discussion of difficulties with secretaries), the ICC filed a pleading under the caption "Response of the Interstate Commerce Commission to Order of March 27, 1987." The response stated in pertinent part:

The ICC respectfully states that it is unable to comply with the Court's order,

. . .

1. The Court's order of March 27, 1987, entered without formal notice of the proceeding to the ICC, requires that the agency reach a decision by April 3, 1987, on a petition for declaratory order filed with the agency on February 10, 1987. A reply and a response thereto have been filed. However, in the short time available it is impossible for the Commission to reach a disposition of that

petition by the date specified by the Court in its order.

The consideration of the issues raised by the petition, which seeks a holding applicable to the motor carrier industry generally that "a joint venture may only operate as a motor carrier if it holds required authority in its own name," ... cannot be summarily and hastily concluded. Indeed, as it presents a request for an order of general applicability, the petition for declaratory order is much broader in scope than the factbound, contractual issues pending before this Court in the instant proceeding, and thus requires due deliberation and possible public comment before the ICC can determine whether or not to issue a declaratory order.

2. Because the issue posited by the Court's order is currently pending before the ICC, it would be improper for the General Counsel or any other staff element of the Commission to issue any opinion on the question. Therefore, we must respectfully decline to respond to the Court's order on the ground that it is impossible for the Commission to do so within the one week deadline impaired [sic] in the order.

ICC Resp. filed Apr. 2, 1987, at 1–2 (footnotes omitted).[2]

The ICC's nonresponsive filing could have given some indication of what rules or logistical problems prohibit it from rendering a decision on a matter that had been briefed. It might have indicated how long an interval after April 3, 1987, a decision could be reached, so that the court could learn from the parties whether the schedule for the court action could be adjusted to accommodate the ICC's schedule. The public interest would have been served by disgorging this minimal information, especially since the ICC's prior encounter with the same question in the context of an

---

**2.** It should be noted that the ICC in the past has given the Comptroller General an informal opinion. *See Sillco, Inc.*, Comp.Gen. B–188026, at 4 (Apr. 29, 1977), 77–1 C.P.D. ¶ 296, at 4. Indeed, the GAO in *Sillco* ordered the contracting officer to reconsider his responsibility determination because the record did not reflect

whether he had "undertaken to ascertain an ICC position" on the question whether a subsidiary could have an agency agreement to move interstate under its parent's ICC authority, Comp. Gen. B–188026, 77–1 C.P.D. ¶ 296, at 5, even though at the time the ICC had the issue *sub judice* in another case.

uncertified agent bidder's listing its principal's ICC authority and subcontracting to the principal the interstate work led to an unjustifiably delayed decision, as so described by an ICC Commissioner. *Bud's Moving & Storage, Inc.*, 126 M.C.C. 56, 67 (1976) (Murphy, Comm'r, concurring).

In failing to provide either type of information, the ICC failed to assist the judiciary in a capacity in which the ICC fully is capable and presumably has expertise. The only useful information contributed by the ICC was a footnote: "Any opinion by the General Counsel would be non-binding, in any event, as the ICC has not delegated decisionmaking powers to that official." ICC Resp. filed Apr. 2, 1987 at 2 n. 2. This statement suggests that the opinion obtained from the ICC staff member on which the contracting officer relied was not binding on the ICC.

2. The Federal Circuit recently summarized the standards that are to guide this court's decision in pre-award bid protests:

[The bidder's] suit is in essence one for breach of an implied contract to treat its bid fairly and honestly. *See, e.g., National Forge Co. v. United States,* 779 F.2d 665, 667 (Fed.Cir.1985); *CACI, Inc.-Federal v. United States,* 719 F.2d 1567, 1573 (Fed.Cir.1983); *United States v. John C. Grimberg,* 702 F.2d 1362, 1367 (Fed.Cir.1983). A breach occurs in such situations if the contracting agency acts in an arbitrary and capricious, *i.e.,* irrational or unreasonable, manner in rejecting the bid. *See, e.g., National Forge Co. v. United States,* 779 F.2d 665, 667 (Fed.Cir.1985); *CACI, Inc.-Federal v. United States,* 719 F.2d 1567, 1573 (Fed. Cir.1983); *Burroughs Corp. v. United States* [223 Ct.Cl. 53], 617 F.2d 590, 597 (Ct.Cl.1980); *Keco Industries, Inc. v. United States* [203 Ct.Cl. 566], 492 F.2d 1200, 1203–04 (Ct.Cl.19[7]84). The Claims Court should be allowed to enjoin the agency from awarding contracts, and thereby to interfere with the procurement process, "only in extremely limited circumstances." *CACI, Inc.-Federal,* 719 F.2d at 1581 (quoting *United States v. Grimberg,* 702 F.2d 1362, 1372 (Fed. Cir.1983)).

*NFK Eng'g, Inc. v. United States,* 805 F.2d 372, 375–76 (Fed.Cir.1986).

■ If plaintiff had sought a temporary restraining order or a preliminary injunction, it would have been required to show a strong likelihood that it would succeed on the merits. *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir.1977). Having moved for summary judgment, defendant now contends that plaintiff must show a strong likelihood of success by clear and convincing evidence. Defendant agreed to withhold award of the subject contract until April 30, 1987, so that plaintiff's challenge could be adjudicated. By doing so, defendant obviated the need to rule on the application for a temporary restraining order and motion for preliminary injunction. At issue is whether plaintiff is entitled to an injunction prohibiting the award of the subject contract to anyone other than plaintiff, not whether plaintiff qualifies for an interim injunction. In short, the question is not whether plaintiff can show a strong likelihood of success, but whether plaintiff succeeds in showing by a preponderance of evidence either that the contracting officer's decision was irrational or involved a violation of statutes or regulations. *See Harris Data Communications, Inc. v. United States,* 2 Cl.Ct. 229, 237, *aff'd mem.,* 723 F.2d 69 (Fed.Cir.1983).

■ Even if the propriety of emergency or preliminary injunctive relief were at issue, however, a movant is not required to prove a strong likelihood of success on the merits by clear and convincing evidence. In *DLM & A, Inc. v. United States,* 6 Cl.Ct. 329, 331 (1984), this court pointed out that the Tenth Circuit's decision in *Goldammer v. Fay,* 326 F.2d 268, 270 (10th Cir.1964), the source of the putative standard, does not describe in such fashion the quantum of evidence that must be shown to warrant interim injunctive relief. Almost three years later, defendant still persists in erecting this virtually insurmountable barrier. If a party were required to show a strong likelihood of success by clear and convincing evidence to merit temporary or prelimi-

nary injunctive relief, he might as well be asked to win in the first place, which would obviate the need for an interim injunction to preserve the status quo before a full hearing on the merits. Strong likelihood of success on the merits, the traditional formulation, is a sufficient requirement to assure that interim injunctive relief will not issue improvidently.

■ Plaintiff's showing of irreparable harm was not entirely on point, insofar that plaintiff argued that its employees would be dislocated absent an injunction. However, defendant should have acknowledged that an unsuccessful bidder can show irreparable harm merely by alleging that it will not be awarded the contract and earn the consequent profits thereunder. *See Essex Electro Eng'rs, Inc. v. United States*, 3 Cl.Ct. 277, 287 (1983). The D.C. Circuit has been the source of law on bid protest actions until the Federal Circuit declared the law in this circuit for the new jurisdiction conferred by 28 U.S.C. § 1491(a)(3) (1982). *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1302 (D.C.Cir.1971), recognized that an action at law by a dissatisfied bidder would be unavailing because it could only recoup its bid preparation costs in a suit for damages, but not loss of anticipated profits. *Accord General Elec. Co. v. Seamans*, 340 F.Supp. 636, 640 (D.D.C.1972). Both cases reason that public interest concerns can militate against the availability of an equitable remedy, but irreparable harm nonetheless is recognized as the limitation of recovery in an action at law to bid preparation costs.

One of the two remaining considerations is whether defendant, the joint venture, or any other interested party will be harmed by an injunction. Even with an injunction in place, the procurement could not be delayed. Moreover, the interests of national defense or national security do not support withholding permanent injunctive relief. The issue turns on whether the joint venture would be harmed.

■ The final consideration—the public interest—is troublesome. Involved in this inquiry is the balancing of the Government's interest "in the smooth and efficient functioning of the procurement process at the expense of the interests of the unsuccessful bidder in the integrity of the bidding process and equal access to the procurement dollar." *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 846 n. 9 (D.C.Cir.1982). Here, plaintiff is not the apparent low bidder, having bid slightly over $100,000, or 22 percent, more than the joint venture. In this epoch of bloated federal deficits, with critical eyes cast on the Department of Defense, the economy to the Government of the bid offered by the joint venture cannot be discounted.

■ 3. The first issue on the merits is whether FAR § 52.247–2 requires that the joint venture certify that it holds interstate operating authority. The GAO characterized the regulation as a listing requirement and not a definitive responsibility criterion. Decisions of the Comptroller General are not binding on the Claims Court. *National Forge Co. v. United States*, 779 F.2d 665, 668 (Fed.Cir.1985) (citing cases). FAR § 47.207–1(a), which mandates the inclusion of FAR § 52.247–2 in solicitations and is reiterated in the preamble to FAR § 52.247–2, states that the clause shall be inserted "when regulated transportation is involved." Both regulations go on to state that insertion of the clause is optional when a federal move "is intrastate and the contracting officer determines that it is in the Government's interest not to apply the requirement for holding or obtaining State authority to operate within the State." The plain meaning of these regulatory provisions is that the clause need not be included in a solicitation when a move is intrastate. Interstate transportation of used household goods cannot be made legally without a permit to transport goods in interstate commerce. *Bud's Moving & Storage, Inc.*, 126 M.C.C. at 59–60. Although the GAO was correct that FAR § 52.247–2 does not abrogate the contracting officer's discretion to use the response in connection with other information to determine responsibility, the clause reiterates the ICC's requirement that the interstate

moving authority must be held if the move is interstate.

*Sillco, Inc.,* Comp.Gen. B–188026, at 4 (Apr. 29, 1977), 77–1 C.P.D. ¶ 296, at 4, does not require a different result. In that case the listing requirement in the solicitation was mandatory. Although the phrasing of the solicitation in this case is not, the regulatory requirement that the authority be held for interstate moves cannot be circumscribed by how the question is phrased.

 4. The second issue on the merits is whether the joint venture must hold ICC operating authority in its own name. Plaintiff argues that *Bud's Moving* is the controlling law and mandates that ICC operating authority be held in the name of the contractor. The thrust of defendant's argument is that plaintiff has failed to establish that a joint venture should be treated like a partnership, such that both entities must have the requisite interstate operating authority. At argument defendant described the state of the law on joint ventures as "vague," and plaintiff characterized it as "all over the lot." The point defendant makes is that plaintiff must establish that the contracting officer's decision is irrational or not in accordance with law in an unsettled area of the law. According to defendant, if joint ventures are legal entities, and the Government encourages their participation in procurement as entities pooling the property or characteristics of each on behalf of the venture in order to accomplish the goals of a particular procurement. According to defendant, if plaintiff's position were adopted—requiring the joint venture to hold in its own name all the authorities possessed by the co-venturers—the joint venture would have no reason to form, and the Government would lose the flexibility and economies of dealing with joint ventures. With no purpose to be served by pooling, the co-venturers would bypass the joint venture to form a corporation in order to limit liability.

*S–M–M–S v. United States,* 1 Cl.Ct. 188 (1982), was another injunctive action in which the contracting officer was held to have denied erroneously award of a cost-plus contract to a joint venture on the ground that one of its co-venturers was performing a fixed-price contract on the jobsite. The court in that case took a pragmatic approach, ruling that "the joint venture and individual member are separate and distinct legal entities, and are not one and the same 'contractor.'" 1 Cl.Ct. at 191. The court in *S–M–M–S* remarked: "The formation of joint ventures to perform certain contracts (particularly construction contracts) is not an unusual practice as indicated by the number of joint ventures presently performing fixed-price contracts on the jobsite in issue." *Id.* at 189 (brackets surrounding quoted material omitted).

Notwithstanding *S–M–M–S,* plaintiff has offered no controlling legal authority or factual or policy argument that would limit the competence of the contractor under the solicitation at bar to the qualifications that the joint venture holds, irrespective of those held by the co-venturers. Such an argument does exist and was recognized by the ICC in *Bud's Moving.* There an uncertified agent of a national van line carrier used the principal's authority to bid on a similar contract. The ICC found:

> We find that a "pack-and-crate" contractor for the U.S. Armed Services must hold, in its own name, operating authority as a motor carrier where it performs the incidental transportation of used household goods shipments in movements extending beyond the commercial zone boundaries of any single point in connection with the said contract and that an agent of an authorized motor carrier cannot "use" or "lease" the operating authority of the principal.

126 M.C.C. at 66. Presaging that the practice could subvert the purpose of small business set-asides, the ICC said:

> Approval of the petitioner's described lease arrangement, or other similar schemes wherein an uncertified agent of a national van line carrier could bid on and be awarded a military containerization contract simply by using the principal's authority, would have disastrous results. It would destroy the substantial investments made by other household

goods carriers in applying for, and receiving, operating authority from this Commission. It would also have the effect of eliminating regulatory controls of this Commission over the transportation of pack-and-crate operators. Lastly, it could bankrupt many of the smaller household goods carriers by authorizing uncertified agents of national van lines to bid on contracts since, conceivably, such agents could consistently underbid the independent carriers. We believe these effects to be contrary to public interest and the national transportation policy.

*Id.* at 65–66.

In this case both co-venturers qualify as small businesses, so that the use of the joint venture was not a subterfuge to avoid the limitations on small business set-asides or to put forward operating authority not held by one of the two principals. The *Bud's Moving* decision was a product of the ICC's concern whether "an operator may 'use' the authority of another carrier in bidding on a DOD contract...." *Id.* at 64. The Comptroller General earlier recognized this vice in disallowing uncertified bidders to subcontract work to interstate carriers. *See, e.g., Victory Van Corp.,* 53 Comp.Gen. 750, 752 (1974); 50 Comp.Gen. 753, 758 (1971); 36 Comp.Gen. 649, 650 (1957). In the case at bar, neither the joint venture nor the co-venturers purport to derive the competence to perform interstate moves from anyone other than Zenith, a co-principal of the bidding entity.

Plaintiff correctly argues that the ICC, not this court, is the decisionmaker on national transportation policy for interstate transport of used goods. Pending before the ICC, at plaintiff's insistence, is the question whether a joint venture must have motor carrier authority in its own name. The court can defer to the ICC, which plaintiff suggests (with plaintiff performing a part of the contract on a month-to-month basis in the interminable period before the ICC makes its decision), or the question can be decided on the existing decisional law, *Bud's Moving.*

The latter approach is commended because *Bud's Moving,* by ruling that a contractor actually performing a government containerization contract must hold in its own name the requisite operating authority, stands for the general proposition that the principal to a bid must hold the requisite operating authority. Here, the contractor is two entities, one of which is an interstate carrier. Contrary to plaintiff's assertion, the joint venture will not be required to lease its motor carrier authority from Zenith, since Zenith is one of the two entities comprising the contractor. On this basis it is concluded that the joint venture does not run athwart the state of the regulatory law today.

Since a contracting officer is to be given discretion in making his procurement decision, it would seem appropriate to recognize the role of common sense. If *Bud's Moving* were given application apart from the specific facts and policies it turned on, the result would be that even if both co-ventures held ICC operating authority in their own names, the joint venture would be nonresponsible. It is determined that upholding the contracting officer's decision as rational and in accordance with law is consistent with the ICC's decision in *Bud's Moving.*

*Loyola College & NonPublic Educ. Servs., Inc.,* Comp.Gen. B–205994.2 (May 16, 1983), 83–1 C.P.D. ¶ 507, is instructive. The solicitation had an accreditation requirement. In defending the requirement, the government agency stated that its intent was to have "the accredited institution serve as sole contractor with full responsibility for the program." Comp.Gen. B–205994.2, at 6, 83–1 C.P.D. ¶ 507, at 6. The agency took the position before the Comptroller General that "Loyola's participation in the joint venture is far short of that required to assure the quality performance contemplated by the accreditation requirement...." *Id. Loyola* can be extrapolated to the general proposition that, given the unsettled law on joint ventures, the agency's view of the purpose sought to be accomplished by a certification requirement should carry great weight in determining whether a joint venture is a responsible

bidder. The goal of the subject procurement is that the contractor provide both interstate and intrastate transport, as required. Although the ICC operating authority is not personal to the joint venture, or held by the joint venture in its own name, *see Bud's Moving*, 126 M.C.C. at 57, one of the co-venturers can provide what is required.

■ 5. The ICC has advised the court that informal opinions are nonbinding. *Cf. Inter-Con Securities Sys., Inc. v. Orr*, 574 F.Supp. 250, 253, 255 (D.D.C.1958) (cognizant state agency's opinion that license held by co-venturer sufficient to allow award to joint venture); *Loyola College & NonPublic Educ. Servs., Inc.*, Comp.Gen. B–205994.2, 83–1 C.P.D. ¶ 507 (accrediting council's opinion that college's accreditation could not be transferred to joint venture, which was to perform teaching services requiring a license, basis for finding of nonresponsibility). As a result, the information relied on by the contracting officer—*viz.*, his subordinate's conversation with an ICC employee to the effect that there was no problem with Zenith's having the authority while its co-venturer did not—is not binding on the ICC.

The record before the court discloses that the contracting officer learned from some source that Zenith held ICC operating authority, but does not reflect any analysis, other than the nonbinding advice of the ICC from the telephone conversation of the contracting officer's subordinate, of the joint venture's responsibility to perform the required interstate carriage. However, as long as the contracting officer's decision was not contrary to law, the fact of his reliance on the unauthorized opinion of an ICC employee does not undercut the reasonableness of the decision. What sustains the contracting officer's decision ultimately is what has been developed in court.

Enough has been put on the record to establish that Zenith has the requisite authority, that both principals to the joint venture will perform the contract, and that contract performance can be divided between the intra- and inter-state carriers without inhibiting the competence of performance or frustrating the requirement for motor carrier authority.

The result reached is opposite to that in *S–M–M–S*, but shares with that case its pragmatic approach. Piercing a joint venture to find a contractor responsible, as this court does, and refusing to do so for the same purpose, as did the court in *S–M–M–S*, are consistent if the analytical premise is to further the purpose of the contract in light of the purpose of the regulation sought to be imposed.[3]

■ 6. Joint ventures that emerge opportunistically are suspect, as recognized by the Comptroller General in *Loyola*. Comp.Gen. B–205994.2, at 7, 83–1 C.P.D. ¶ 507, at 7. The joint venture in this case is verbal; its one act was to submit a bid. However, the joint venture withstands scrutiny insofar as it does not amount to a subterfuge, or subvert the purpose the Army wants to accomplish by award of the contract, or put forward an uncertified carrier as the contractor responsible for performing the carriage.

For all the above reasons, it is found that plaintiff fails to succeed on the merits.

7. Although plaintiff has shown irreparable harm, it cannot show that an injunction would not harm the joint venture, since the latter qualifies for contract award. Moreover, the public interest would be disserved by restricting award to plaintiff, when the joint venture bid significantly less and no showing has been made to disqualify the joint venture.

---

**3.** The Comptroller General in *A.D. Roe Co., Inc.*, 54 Comp.Gen. 271 (1974), ruled a bid nonresponsive on the ground that the bond named a joint venture comprised of the bidder and another, whereas the bid was solely in the bidder's name. Thus, the principal on the bond and the entity bidding were not the same legal entities. To the same effect is *McNamara Lunz Warehouses; Central Moving & Storage, Inc.*, Comp. Gen. B–188100 (June 23, 1977), 77–1 C.P.D. ¶ 448. Responsiveness determinations are governed strictly by the submitted papers, whereas the contracting officer has more latitude in determining responsibility. Even so, the purpose of the requirement that the bidder and bond holder be the same is self-evident.

**286**

## CONCLUSION

Based on the foregoing,

IT IS ORDERED, as follows:

1. Plaintiff's application for a temporary restraining order and motion for a preliminary injunction were mooted by defendant's agreement to withhold award of the subject contract until April 30, 1987.

2. Defendant's motion for summary judgment is granted, and the Clerk of the Court shall dismiss the complaint.

3. At argument plaintiff requested whether the court would grant an injunction pending appeal. Defendant took the position that award will not be withheld pending appeal. Because it is concluded that defendant prevails so decisively, plaintiff's request must be denied. Plaintiff shall be deemed to have moved unsuccessfully for an injunction pending appeal.

No costs.