**TRW ENVIRONMENTAL SAFETY SYSTEMS, INC., Petitioner,**

v.

**The UNITED STATES, Defendant,**

**and**

**Bechtel National, Inc., Defendant–Intervenor.**

No. 747–88C.

United States Claims Court.

March 22, 1989.

See also 16 Cl.Ct. 516.

Kenneth B. Weckstein, Washington, D.C., attorney of record, for petitioner.

Gordon D. Kromberg, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant.

Lawrence M. Farrell, Washington, D.C., attorney of record, for defendant-intervenor.

## OPINION

REGINALD W. GIBSON, Judge:

*Introduction*

This pre-award bid protest case comes before the court on petitioner's, TRW Environmental Safety Systems, Inc.'s (TESS), motion to preliminarily enjoin the Department of Energy (DOE) from awarding a contract or disbursing funds under Re-

quest for Proposal No. DE–RPO1–88RW00134 (the RFP). Said RFP seeks an offeror for negotiation leading to the award of a management and operating (M & O) contract for systems engineering, development, and management of the nuclear waste management system for the Office of Civilian Radioactive Waste Management (OCRWM), Department of Energy. In short, it requires the successful bidder to manage the development of, and to operate, the nation's first nuclear waste depository site to be located in the Yucca Mountains of Nevada. The operating budget of said contract is expected to exceed $1 billion, in that its performance period is ten (10) years at approximately $100 million per year.

Bechtel Systems Management, Inc. (BSMI), on or about December 9, 1988, was selected by DOE, through OCRWM, to begin negotiations leading to award of said contract. TESS claims that DOE's Source Evaluation Board (SEB), in selecting BSMI, failed to adhere to the established criteria set forth in the RFP, thereby treating its bid unfairly. Additionally, TESS charges that the chairperson of the SEB violated a federal statute, § 7216 of Title 42, by participating in a DOE proceeding within one year after terminating employment with a particular energy concern that was substantially involved in said proceeding, again causing its bid to be unfairly treated.

The testimony given at the four-day hearing on the present motion supports TESS's contention that grave issues were raised and the balance of hardships tips sharply in its favor. This is particularly true where, as here, in the court's opinion, a possible violation of § 7216 raises serious questions compelling further litigation. Therefore, TESS's motion for a preliminary injunction is GRANTED.

*Facts*

Seeking to attract proposals from the most qualified entities both inside and outside of the nuclear industry, DOE placed a notice in the *Commerce Business Daily* (CBD) on February 13, 1987, of its intent to issue a solicitation for a "Systems Engineering and Development Contractor for the First Geological Repository Program." This notice was the first public announcement of what has come to be known as the procurement for Systems Engineering, Development and Management of the Nuclear Waste Management System for the Office of Civilian Radioactive Waste Management (OCRWM), *i.e.*, the "SEDM contract." Under the SEDM contract the contractor shall be the Systems Engineering, Development and Management Contractor for the Nuclear Waste Management System for OCRWM and shall perform work and services associated with the OCRWM Program as indicated in the Scope of Work. Said work shall include but is not limited to—coordinating the design of a repository to dispose of high-level nuclear waste; obtain a license from the Nuclear Regulatory Commission (NRC) for the construction and operation of such repository; manage and maintain appropriate facilities, and to ensure that the system is optimized, that the interfaces between the systems elements are clearly specified and controlled including considerations relating to transportation; and that the initial repository site candidate is properly characterized consistent with the Nuclear Waste Policy Act of 1982 (NWPA). 42 U.S.C. § 10101 *et seq.*

The SEDM contract is of a ten-year duration with a five-year renewal option in DOE. The overall contemplated time frame envisioned with respect to the four phases of the repository program is as follows:

| Activity | Year(s) |
|---|---|
| (i) Site Characterization (and licensing) | 1988–1998 |
| (ii) Construction | 1998–2003 |
| (iii) Operations | 2003–2053 |
| (iv) Closure and Decommissioning | 2053–2060. |

In summary, construction of the repository is presently scheduled to begin in 1998 and to be completed by the year 2003. For the next fifty (50) years thereafter, the repository is to be filled with high-level nuclear waste and spent fuel. Sealing and securing the repository will take another seven years thereafter. At this posture, the repository must be capable of protecting the earth from exposure to the deposited radioactive waste for a period of 10,000 years

—a truly staggering length of time when one considers that history itself is only about 6,000 years old.[1] Moreover, the foregoing objective emphatically underscores the criticality of this procurement program.

On June 3, 1987, DOE provided all potential offerors with a document referred to as the "Draft Statement of Work," which outlined the tasks and responsibilities expected of the successful contractor. A pre-solicitation conference was held, thereafter, on June 16, 1987, so as to brief prospective offerors on the OCRWM Program Background and the Statement of Work.

DOE had, by this time, assembled a Source Evaluation Board (SEB), a team of DOE officials who were to issue the RFP, evaluate all the proposals, and make a recommendation to the Source Selection Official (SSO), i.e., the DOE Assistant Secretary for Management and Administration, as to which entity should be awarded the SEDM contract. The SEB members were selected by Mr. Ben Rusche, Director of OCRWM. Testifying at the hearing on the present motion, Mr. Rusche was not able to recall the exact date that the SEB was "constituted officially," but did state that it was perhaps in April, May, or June of 1987. The SEB was chaired by Mr. Sam Rousso, who was also appointed by Mr. Rusche on May 1, 1987. According to his own testimony, Mr. Rousso terminated employment with Science Applications International Corporation (SAIC), a subcontractor on the BSMI team under the current procurement,[2] sometime in May or June of 1986 in order to join DOE.

Following thereon, the SEB, of which Mr. Rousso was chairman, issued a copy of the RFP on October 5, 1987, to all parties that had requested it.[3] The RFP contained, inter alia, a detailed description of the following evaluation criteria to be considered by the SEB in making the recommendation to the SSO as to whom should be the awardee:

*General Management Evaluation Criteria*

  1.  Key Personnel
    a.  key lead managers
    b.  key managers
    c.  selected lower-level managerial and nonmanagerial personnel
  2.  Corporate Capability
    a.  corporate experience
    b.  corporate commitment

*Business Management Evaluation Criteria*

  1.  Project Management Approach
  2.  Transition Plan
  3.  Organization

*Technical Evaluation Criteria*

  1.  Technical Approach
    a.  repository
    b.  waste system design, monitored retrievable storage (MRS) and transportation
    c.  technical control system

*Financial Considerations.*

Additionally, the RFP included a descriptive adjectival grading system, i.e., outstanding, good, satisfactory, poor, and unsatisfactory, to be utilized in rating the proposals, as well as a general explanation of the value to be assigned to each criterion. The deadline for submission of proposals, as stated in the RFP, was April 25, 1988.

—Shannon and Wilson
—Los Alamos Technical Associates.

---

1.  Six thousand (6,000) years ago, roughly 4,000 B.C., is often cited as the demarcation between "history" and "pre-history," for it is in this period that the Sumerians of Mesopotamia created the first writings. *See World Almanac & Book of Facts, History of the World*, 473 (1989).

2.  The successful contractor's (BSMI's) team of subcontractors was as follows:
    —Westinghouse Electric
    —Battelle Memorial Institute
    —Science Applications International Corporation
    —Parsons, Brinckerhoff, Quade and Douglas
    —Dames and Moore

3.  Said RFP was subsequently amended four (4) times. Under the original RFP, three (3) sites were to be evaluated as possible locations for the repository. Because the project had fallen far behind schedule, the fourth (4th) amendment to the RFP limited the number of sites to be evaluated from three to one, i.e., the Yucca Mountain site in Nevada. This amendment also reflected the changes made by the 1987 amendment to the NWPA. *See* Nuclear Waste Policy Amendments Act of 1987.

Only three offerors (out of 360 firms who were provided the RFP) submitted timely proposals, *i.e.*, TESS, BSMI, and Systems Engineering Management Company (SEMCO). TESS, a wholly owned subsidiary of TRW Corp., was created for the sole purpose of submitting a proposal and executing the SEDM contract. BSMI, similarly, is a subsidiary of Bechtel National, Inc. and was to be formed only in the event that Bechtel's proposal was selected.

Between April 25 and July 7, 1988, the SEB evaluated the foregoing proposals of the three entities. All three proposals were placed in the competitive range. Thereafter, the SEB then developed a list of questions that addressed identified weaknesses in each entity's proposal. The offerors responded to these questions by August 29, 1988. Discussions were subsequently held in Washington, D.C. from September 14 through 16, 1988, at which time each offeror made an oral presentation of its proposal. This caused the SEB to distribute additional questions to the offerors in order to clarify certain ambiguities that had arisen in the oral presentations or as a result of the earlier responses. On September 20, 1988, the three offerors were informed that each would have until October 4, 1988, to submit a revised proposal, which manifested their "best and final submission." Each party complied. Still more questions regarding organizational conflicts of interest were distributed on October 29, 1988, and responses were received, as required, by November 4, 1988. Finally, further clarification questions were distributed on November 22, 1988, and timely responses were received by November 29, 1988.

DOE notified the three offerors by letter dated on or about December 9, 1988, that BSMI's proposal had been selected for negotiations leading to award of the SEDM contract. The SSO issued a Source Selection Statement (SSS) on the same day explicating what the strengths and weaknesses of each proposal were and the justification for the selection of BSMI. A debriefing was held on December 19, 1988, at which DOE advised TRW that its proposal was not selected because of the following reasons:

1. TESS's key employees lacked nuclear experience;

2. subcontractors proposed by TESS lacked sufficient nuclear experience comparable to the SEDM contract;

3. the TESS proposal lacked a centralized systems engineering approach; and

4. TESS's president was to report to a group of TRW (the parent corporation) vice-presidents.

With respect to proposal submissions contained in Volumes II, III, and IV, BSMI received an overall adjectival rating of "good," whereas TESS's rating was "satisfactory." TESS, allegedly, spent over $3.5 million in preparing its proposal. On December 23, 1988, TESS filed a complaint in this court alleging that DOE had failed to follow the criteria stated in the RFP in selecting BSMI for negotiations leading to award. In its complaint, TESS sought, *inter alia*, a temporary, preliminary, and permanent injunction which would preclude DOE from awarding the SEDM contract to anyone other than TESS. Because TESS never filed a motion for a temporary restraining order, the court never considered granting one. On February 13, 1989, fifteen (15) days prior to the date that DOE had targeted to award the SEDM contract (February 28, 1989), TESS filed this motion for preliminary injunction. DOE agreed to abstain from awarding the SEDM contract until after midnight on March 8, 1989, in order to allow the respective parties sufficient time to prepare for a hearing on the motion for a preliminary injunction. Previously, on February 21, 1989, the court granted BSMI's motion to intervene in the present action.

This opinion follows a four-day hearing on the present motion for a preliminary injunction held from March 3 through March 7, 1989, at which all parties were represented. Following thereon, the court issued a verbal ruling from the bench, and this opinion memorializes that ruling.

*Contentions of the Parties*

*Petitioner*

TESS postured its case consistent with the elements necessary to sustain a preliminary injunction, *i.e.*, that there is a substantial likelihood that petitioner will succeed on the merits; petitioner will suffer irreparable harm if the injunction is not granted; petitioner has an inadequate remedy at law; and the public interest requires that subject motion be granted.

The first element of TESS's argument—substantial likelihood of success—contains two basic claims. First, the award decision by DOE was not made in accordance with the RFP, and it is, therefore, arbitrary and capricious. TESS further argues that (i) it did not receive credit for exhibiting a superior corporate commitment; (ii) TESS was unfairly penalized because its key lead managers did not possess nuclear experience when such is not listed as a requirement in the RFP, and TESS was informed that a lack thereof would not preclude it from being awarded the SEDM contract; (iii) TESS was not properly credited for having corporate experience on large governmental projects because such projects were not nuclear related, and the RFP imposes no such requirement; (iv) TESS's systems engineering approach was not properly credited because it was not centrally located even though decentralization would be more cost effective and is the "essence of systems engineering"; (v) the SEB placed excessive emphasis on nuclear experience given the fact that this project was not nuclear in and of itself, and the SEB failed to credit the TESS team members for having extensive nuclear experience; (vi) the SEB did not consider geological experience in making its determination even though geological concerns are an integral part of this project; (vii) the SEB members themselves lacked systems engineering experience on the Board and did not use the same as an evaluation criterion although the project contemplated its use; (viii) TESS's proposal was unfairly downgraded for not having a cost schedule control system that was validated, even though the RFP did not require such vali-

dation; and (ix) BSMI is ineligible for the contract award because it had not yet been incorporated when its proposal was selected and because Bechtel owns many foreign subsidiaries that were not examined by the SSO. Secondly, TESS argues that Mr. Rousso's (the chairman of the SEB) participation—in the development of the RFP, in meetings concerning the SEDM contract, and in formulating the statement of work —*within one year* following his termination with SAIC, a BSMI team member, is a violation of 42 U.S.C. § 7216. This allegedly is what caused TESS's bid to have been treated unfairly. Additionally, TESS points to a myriad of contracts between DOE and various members of the BSMI team, and argues that *conflicts-of-interest* created by such contracts were not considered by the SEB.

Turning to the next two elements needed to sustain a preliminary injunction, TESS estimates its total lost profit to be $150 million over the next 15 years. As anticipatory profits are not recoverable in bid protest actions, TESS argues, it will be irreparably harmed and is without an adequate legal recourse.

Lastly, as to the public interest, TESS suggests that its proposal could save the public $2 million over the next fifteen (15) years due to its decentralized systems engineering approach. Furthermore, the organizational conflicts of interest could affect public safety. In this regard, TESS reminds the court that this project will affect citizens of North America for thousands of years, and safety concerns, therefore, take on a magnified significance.

*Defendant*

Defendant first argues that TESS cannot meet the element of substantial likelihood of success. With respect to petitioner's claims involving the SEB's alleged unfair preference toward nuclear experience, defendant, in short, points to several references in the RFP discussing "technical experience" as it relates to the work to be performed under the SEDM contract. As for TESS's claims regarding the propriety of considering or failing to consider a particular evaluation criterion, such as sys-

tems engineering, geological experience, or nuclear experience, etc., defendant reminds the court that its limited jurisdiction in bid protest cases precludes it from entertaining a challenge to the *terms* of the RFP, and that it may only challenge the application of those terms. Additionally, with respect to TESS's claim that systems engineering should have been considered more heavily, defendant suggests that the fourth amendment to the RFP, that reduced the number of sites under consideration from three to one, greatly reduced the importance of a decentralized systems engineering approach. Lastly, defendant answers TESS's claims that the SEB failed to consider organizational conflicts of interest in BSMI's proposal by quoting directly from the Source Selection Statement (at p. 12):

> Finally, the Board carefully examined the Organizational Conflict of Interest (OCI) disclosures submitted by each offeror.... [E]ach offeror had many potential OCI problems to discuss.... *All potential OCI problems ... were satisfactorily resolved....*

(emphasis added).

Addressing the second element, irreparable injury, defendant argues that because TESS's claims of injury are entirely speculative, it cannot claim anticipatory profits as a loss. Therefore, defendant maintains, monetary damages for bid preparation costs provide TESS with an adequate remedy.

Defendant next introduces the problems to be faced by the government should the preliminary injunction be granted, arguing that such harm outweighs any faced by TESS if it is not granted. Defendant explains that spent nuclear fuel and high-level radioactive waste is presently being stored in temporary holding pools in various locations around the country and the urgent need to contain such waste in a *permanent* disposal site is of ever increasing urgency. Says defendant, the "aggres-

sive schedule" set by Congress in constructing this repository cannot be set back without increased costs to the public and an increased risk of forcing reactors to shut down in the future due to lack of waste storage facilities.

Defendant underscores the above argument regarding the urgency of this project in refuting TESS's claim that it is within the public interest to enjoin DOE.

### Defendant–Intervenor

Aside from the averments set forth under defendant's contentions, defendant-intervenor's first argument is a general denunciation of petitioner's claim in that it is outside the scope of the complaint. Additionally, defendant-intervenor states that Mr. Rousso's participation in the SEDM procurement did not violate 42 U.S.C. § 7216. It argues that this is so because petitioner has not shown that SAIC is an "energy concern." Moreover, defendant-intervenor contends that SAIC's involvement in the SEDM procurement does not rise to the level of a "proceeding" as that term is defined under the statute, and, even assuming *arguendo* that it did, SAIC's involvement was not "substantial, direct, or material."

### Jurisdictional Statement

Jurisdiction over this case is conferred upon the court by 28 U.S.C. § 1491(a)(3). *See United States v. John C. Grimberg Co.*, 702 F.2d 1362 (Fed.Cir.1983).

### Discussion

■ To merit equitable injunctive relief in this court, which is deemed extraordinary, a petitioner must show entitlement to such relief by clear and convincing evidence.[4]

Judicial review of an agency's pre-award procurement decision is, and should be, extremely limited in scope. The court should not substitute its judgment on such matters for that of the agency, but should intervene only when

---

**4.** However, in *Reel–O–Matic Systems, Inc. v. United States*, 16 Cl.Ct. 93, 99 (1989), the court stated that—"In order to prevail, a contractor ... must establish that the contracting officer's decision to award the contract to another contractor had no rational basis or that in making

his award, [he] violated an applicable procurement statute or regulation and in a manner prejudicial to the protesting bidder. The Federal Circuit has not held that this evidentiary burden must be discharged by clear and convincing evidence...."

it is clearly determined that the agency's determinations were irrational or unreasonable. It is the burden of the aggrieved bidder to demonstrate that there was no rational basis for the agency's determinations. *Princeton Combustion Research Laboratories, Inc. v. McCarthy,* 674 F.2d 1016, 1021–22 (3d Cir.1982); *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301, 1306 (D.C.Cir.1971). Judicial intrusions into the procurement process are generally limited, circumspect and infrequent, *Allen M. Campbell Co. Gen. Con., Inc. v. Lloyd Wood Const. Co.,* 446 F.2d 261, 264 (5th Cir.1971), as they should be. *M. Steinthal & Co. v. Seamans, supra,* 455 F.2d at 1300. *See also Allen M. Campbell Co. v. United States,* 199 Ct.Cl. 515, 522, 467 F.2d 931 (1972) (Nichols, J., concurring). Where injunctive relief is sought, which relief is deemed drastic in nature, the court must exercise great caution and even then, the aggrieved bidder should be made to establish its right to such drastic relief by means of clear and convincing evidence. *Goldammer v. Fay,* 326 F.2d 268, 270 (10th Cir.1964). Even in the exercise of sound judicial discretion, in the absence of overriding public interest considerations, the court should refuse to look favorably on declaratory or injunctive relief requests in pre-award bid protest actions, and should not overturn any pre-award procurement determination unless the aggrieved bidder establishes that there was no rational basis for the agency's determination. *M. Steinthal & Co. v. Seamans, supra,* 455 F.2d at 1301. [footnote omitted].

*Baird Corp. v. United States,* 1 Cl.Ct. 662, 664 (1983).

Against this background, *generally,* in deciding whether to grant injunctive relief, the court must, of course, consider the operative evidence purporting to establish the existence of several factors. These factors are:

(i) the likelihood of success on the merits;

(ii) the absence of injunctive relief will result in irreparable harm;

(iii) there is no adequate remedy at law; and

(iv) the grant of the motion is in the public interest.

Noted precedent, on the other hand, observes that one seeking a *preliminary* injunction assumes the burden of demonstrating *either*—

(i) a combination of probable success and the possibility of irreparable injury, or

(ii) that serious questions are raised and the balance of hardships tips sharply in his favor.

*Litton Systems, Inc. v. Sundstrand Corporation, et al.,* 750 F.2d 952, 956 (Fed.Cir. 1984); *Charlie's Girls Inc. v. Revlon, Inc.,* 483 F.2d 953, 954 (2d Cir.1973) (per curiam).

Consonant with the foregoing alternative standard, *supra, Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc., et al.,* 559 F.2d 841, 843–44 (D.C.Cir.1977), also noted by citing to *Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 740 (2d Cir.1953), that:

The court is not required to find that ultimate success by the movant is a mathematical probability....

\* \* \* \* \* \*

To justify [an] ... injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (*i.e.,* the balance of hardships tips decidedly toward plaintiff), it will ordinarily be enough that the plaintiff has raised questions ... so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.

\* \* \* \* \* \*

If ... there exists "a fair ground for litigation and thus for more deliberative investigation," a court should not be required at an early stage to draw the fine line between a mathematical probability and a substantial possibility of success....

■ Hence, applying said recognized standard, and because they are in the disjunctive, the resulting issues, noted *infra,*

are two-fold; an affirmative response to either will warrant the granting of petitioner's motion for a preliminary injunction:

(i) Whether the evidence establishes a combination of probable success on the merits and the possibility of irreparable injury; or

(ii) Whether the evidence adduced establishes that serious questions are raised and the balance of hardships tips sharply in petitioner's favor.

For purposes of determining entitlement to relief pursuant to petitioner's motion for a preliminary injunction, it is necessary to address only one of the foregoing issues if the answer thereto is in the affirmative, *i.e.*, whether serious questions are raised and the balance of hardships tips sharply in petitioner's favor.

We begin our analysis by initially focusing on the *serious question* issue and observing that in its complaint petitioner alleged, at paragraph 51, that: "DOE conducted the SEDM procurement contrary to applicable laws and regulations...." At the preliminary hearing, petitioner, consistent with the foregoing, averred and sought to adduce evidence tending to establish that a DOE official violated a federal statute. Specifically, petitioner stated that: "Sam Rousso's participation in the SEDM procurement violated 42 U.S.C. § 7216."

The pertinent part of § 7216 is subsection (a), and it provides as follows:

For a period of one year after terminating any employment with *any energy concern,* no *supervisory employee* shall knowingly *participate* in any *Department proceeding* in which his former employer is substantially, directly, or materially involved, other than in a rulemaking proceeding which has a substantial effect on numerous energy concerns.

42 U.S.C. § 7216(a) (1988) (emphasis added).

The Code of Federal Regulations provides the following pertinent definitions to certain operative terms in § 7216(a):

(i) *Energy concern:* "Any other person ... [s]ignificantly engaged in the business of ... (A) [d]eveloping, extracting, producing, refining, transporting by pipeline, converting into synthetic fuel, distributing, or selling minerals for use as an energy source, or in the generation or transmission of energy from such minerals or from wastes or renewable resources; (B) [p]roducing, generating, transmitting, distributing, or selling electric power; (C) [d]evelopment, production, processing, sale, or distribution of nuclear materials, facilities, or technology; or (D) [c]onducting research, development, or demonstration related to an activity described [above]." 10 C.F.R. § 1010.103(k)(2)(ii) (1988).

(ii) *Supervisory employee:* "An employee or officer who has primary responsibility for the award, review, modification, or termination of any grant, contract, award, or fund transfer within the authority of the Secretary; including ... Source selection officials...." 10 C.F.R. § 1010.103(t)(3)(iii).

(iii) *Department proceeding:* "[A]ny judicial proceeding, Department hearing, application, rulemaking, order, license, contract, grant, award, fund transfer, claim, controversy, charge, accusation, or arrest, in which the Department is directly involved." 10 C.F.R. § 1010.103(h).

(iv) *Participate:* "[I]nvolvement by an employee in a Department proceeding through decision, approval, disapproval, recommendation, the rendering of advice, or investigation." 10 C.F.R. § 1010.103(*o*).

■ While the court, at this posture, and on this record, is not prepared to find and hold that a clear violation of § 7216(a) had the effect of substantially prejudicing the treatment of TESS's bid, nevertheless, it is safe to state, at this juncture, that the record arguably *supports* a finding that grave and serious questions have been raised as to—whether the statute was violated to the detriment of petitioner. Pertinent to the foregoing are the following operative facts:

Mr. Rousso testified at the hearing that he commenced working for SAIC, *i.e.*, the entity which is presently a member of BSMI's SEDM team, in November 1985, which continued until May or June 1986;

while employed at SAIC he worked in an area "that dealt with work that supported contracted defense programs for the Department of Energy"; and he charged his time under such contract(s) which was paid by DOE through SAIC. Transcript 265–266. Additionally, he testified that—he immediately joined OCRWM upon leaving SAIC in May or June 1986; in the summer of 1986, as a major senior official, he got involved in developing the SEDM program with an initial focus on the Statement of Work; in this connection, he attended meetings throughout the fall and winter of 1986, and was a senior manager in the SEDM program; in January, February, and March 1987, he reviewed the Statement of Work put together by the task force; prior to February 13, 1987, he was involved in reviewing draft statements of work for the SEDM contract during which time he chaired SEB's preliminary planning sessions; during this time, SAIC expressed an interest in receiving the RFP; on May 1, 1987, Mr. Rousso was formally appointed Chairman of the SEB, and his duties were to put together the RFP; on or about June 3, 1987, a copy of the draft Statement of Work went out to all entities on Petitioner's Exhibit 6, which included SAIC; Mr. Rousso supervised approximately 50 employees from June 1986 to May 1987; and as of May 1987, approximately 50% to 60% of his work was on the SEDM program. Transcript 60–102.

The court believes that these facts appear to be within the ambit of the "Department proceeding" definition in that they involve a "hearing," "application," "contract," and an "award" in which the Department is involved. The fact that the definition in the Code of Federal Regulations for "supervisory employee" embraces the language used to define "proceeding" tends to support such an interpretation.

During Mr. Rousso's direct testimony, counsel introduced Petitioner's Exhibit 27, the OCI Questionnaire dated April 11, 1988, that had been completed by SAIC and submitted to DOE as part of BSMI's proposal and in which it is indicated that SAIC regarded itself as an "energy concern." The court has little trouble, for purposes of the

preliminary injunction, accepting, on this record, petitioner's contention that SAIC is an energy concern as that term is defined in the regulations. Moreover, Petitioner's Exhibit 6, a list of prospective bidders in this procurement, dated April 2, 1987, also contains the name of SAIC.

This total evidence seems to establish that *within* one year subsequent to his employment termination from SAIC, Rousso was significantly involved in a DOE project to which SAIC was considering submitting a bid, and was probably aware of SAIC's involvement. Whether this conduct (requesting an RFP) on the part of SAIC constitutes "substantial, direct, or material involvement" by a former employer need not be definitively resolved herein. At this posture, the court needs only to find that TESS has raised a "serious" question as to whether § 7216 was violated.

We believe, on this record, that TESS has certainly raised valid questions, going to the merits that are so serious, so substantial, so difficult, or so doubtful as to make them fair ground for more deliberative investigation and further ventilation. *Hamilton Watch Co.*, 206 F.2d at 740. Those threshold questions are—(i) whether in fact and in law Mr. Rousso violated 42 U.S.C. § 7216(a), and, *if so*, (ii) whether said violation substantially prejudiced TESS's bid by causing it to be treated unfairly, irrationally, arbitrarily, capriciously, and not in accordance with law.

It is noteworthy that the defendants have failed to offer any countervailing evidence, testimony, or explanation at the hearing on this issue.

Whether a supervisory employee of DOE violated a federal statute (§ 7216) by participating in the procurement determination of the awardee of the SEDM contract is a most serious question, as it undoubtedly could reflect directly on the *integrity of the procurement process*. Pertinent to the foregoing is § 1010.101 of the Code of Federal Regulations which states:

(a) The following regulations are designed to assure that the business of the Department of Energy (DOE) is conduct-

ed effectively, objectively and without improper influence or the appearance thereof. Further, DOE expects that its employees will ... avoid any action, whether or not specifically prohibited by the regulations, which might result in, or create the appearance of:

(1) Using public office for private gain;

(2) Giving preferential treatment to any person;

(3) Impeding Government efficiency or economy;

(4) Losing complete independence or impartiality;

(5) Making a Government decision outside official channels; or

(6) Affecting adversely the confidence of the public in the integrity of the Government.

(b) The following regulations are issued in compliance with Executive Order 11222, 5 CFR Part 735, and:

.        .        .        .        .

(2) Pub.L. 95–91, sections 601–608 (42 U.S.C. 7211–7218).

The court is greatly troubled by the implication of the foregoing evidence, which raises a strong suggestion of possible "impropriety and influence," and, as a consequence, sees a compelling need to have this matter further explored. This is in everyone's interest. If on the merits petitioner cannot carry its burden, then it is in defendants' interest that this matter be resolved. Conversely, if petitioner can carry its burden, then, of course, it is in its interest that this issue be clarified. Irrespective of the ultimate proof on this issue, it is clear beyond cavil that it is in the public's interest to know the truth in this extremely important procurement. This being the case, the court must now turn its attention to the second element of the equation, and that is—where does the balance of hardships lie?

Both of the defendants have taken great pains in alerting the court as to this nation's *pressing need* for a high-level nuclear waste repository. The defendant has quoted legislators to support its position that this project has been modified in every way possible to bring about its completion

as quickly as possible. The defendant-intervenor has complained that its personnel who are scheduled to perform on the SEDM contract are in a state of flux—unable to begin the SEDM contract or any others. Such downtime, claims the Bechtel management, is costing the company $12,-000 per day.

The court is quite mindful of these concerns. On the other hand, however, recent cases have held that a plaintiff moving for preliminary injunction need only allege, in order to establish irreparable injury, that by failing to enjoin, it will not be awarded the contract and will lose profits thereunder. *See Quality Transport Services, Inc. v. United States,* 12 Cl.Ct. 276, 282 (1987); *Essex Electro Engineers, Inc. v. United States,* 3 Cl.Ct. 277, 287 (1983). These cases are based upon the proposition that an unsuccessful bidder's damages are limited at law to bid preparation costs. *See Quality Transport,* 12 Cl.Ct. at 282.

■ On these facts, if this court were to deny the motion for a preliminary injunction, and thereafter TESS were to be successful on the merits, the resulting delays and extra costs to all parties, including the public, will be exacerbated if BSMI has already been awarded the contract and has begun performance thereunder. In the past, this court has held that a plaintiff's need "to engage in extensive post-award activities to restore the status quo" constitutes immediate and irreparable harm warranting a grant of a preliminary injunction. *See Sterlingwear of Boston, Inc. v. United States,* 10 Cl.Ct. 644, 649 (1986). Furthermore, the court believes that by scheduling the hearing for a permanent injunction, as it has done, within three weeks of the bench ruling on this motion, any resulting delays can be reduced to a length that is rather insignificant in relation to the ten-year duration of the SEDM contract. This is so because should TESS's motion for permanent injunction be denied, the government will thereby have been delayed a little more than one month from its original "ambitious schedule." Because this particular project is of such paramount im-

portance to the public's interest, it can certainly afford a *one-month* delay to ensure that DOE properly adhered to the compelling procurement procedures in awarding this contract. Failing such, the onus embracing this procurement would, to say the least, be rather noxious.

This need to secure the status quo, until a more penetrating look can be had as to the propriety of certain activities during the procurement process—the very purpose of a preliminary injunction—must be respected by the court. *See, e.g., Cordis Corp. v. Medtronic, Inc.*, 835 F.2d 859, 863 (Fed.Cir.1987); *Atlas Powder Co. v. Ireco Chemicals*, 773 F.2d 1230, 1232 (Fed.Cir. 1985). From the present posture of this case, and irrespective as to who prevails, DOE should be in a position to enter forthwith negotiations leading to award with the successful litigant. If the motion for a preliminary injunction were denied and following thereon the contract is awarded, on the other hand, additional pressures of unwinding makes a permanent injunction more vexing and less desirable. In light of such concerns, the court finds that the balance of hardships favors TESS.

*Conclusion*

The foregoing approach, we believe, "is entirely consistent with the purpose of granting interim injunctive relief.... Generally, such relief is preventative, [and] ... it seeks to maintain the status quo pending a final determination of the merits of the suit. An order maintaining the status quo is appropriate when a serious legal question [as here] is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant." *Washington Metropolitan Area Transit Commission*, 559 F.2d at 844.

Therefore, until such time as this court has the opportunity to more fully consider the matters raised, IT IS HEREBY ORDERED as follows:

(i) Petitioner's motion for a preliminary injunction is GRANTED;

(ii) Pending a hearing and a determination on a *permanent* injunction, defendant, the Department of Energy, its officers, agents, servants, employees, and representatives, and all persons acting in concert and participating with it, be and they are hereby preliminarily restrained and enjoined from awarding a contract or disbursing funds under RFP No. DE–RPO1– 88RW00134, to anyone other than the petitioner;

(iii) In view of the *singular* importance of this procurement, in that time is of the essence, this court hereby sets this matter down for a hearing on a *permanent* injunction, etc., on Thursday, March 30, 1989, at 9:00 a.m.;

(iv) (Petitioner shall file its motion for a permanent injunction by Monday, March 13, 1989.) This verbal order from the bench on March 8, 1989, has been complied with; and

(v) (This order is *immediately* effective, but is conditioned on petitioner, TRW Environmental Safety Systems Inc., posting a bond, no later than noon on Thursday, March 9, 1989, in the amount of $1,000,- 000.00, or providing a surety who will furnish a bond in the same amount, subject to the approval of the Clerk of this Court.) This verbal order from the bench on March 8, 1989, has also been complied with.

IT IS SO ORDERED.