**MAGNAVOX ELECTRONIC SYSTEMS COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant,**

**and**

**Motorola, Inc., Intervenor.**

**No. 92–527C.**

United States Claims Court.

Oct. 9, 1992.

William J. Spriggs, with whom was David J. Taylor, Washington, D.C., for plaintiff. Thomas W. Biggs, of counsel.

Domenique Kirchner, with whom was Asst. Atty. Gen. Stuart M. Gerson, David M. Cohen, Director, and James M. Kinsella, Asst. Director, for defendant.

## OPINION

ROBINSON, Judge:

This matter is before the court on plaintiff's application for a preliminary injunction, pursuant to Rule 65 of the Rules of the United States Claims Court (RUSCC); and defendant's motion to dismiss, pursuant to RUSCC 12(b)(1), for lack of subject matter jurisdiction or, in the alternative, for summary judgment, pursuant to RUSCC 56. Alleging violations of the Competition in Contracting Act (CICA), 10 U.S.C. § 2301 *et seq.;* the Federal Acquisition Regulation (FAR), 48 C.F.R. §§ 6.3 *et seq.;* and the policy of "full and open competition", plaintiff seeks to enjoin defendant from awarding a sole-source contract under solicitation No. DAAA09–91–R–0924. This court held oral argument on the two motions on September 4, 1992, in Washington, D.C. The motions were taken under advisement.

At an informal status conference conducted on September 8, 1992, this court strongly suggested that the matter might be resolved if the parties agreed to postpone the sole-source acquisition scheduled to be awarded to Motorola on or about September 29, 1992, and participate in a pre-award survey of plaintiff's establishment. Though plaintiff readily agreed to the court's suggestion, defendant requested a short period of time to consider it. After nearly one week, defendant's counsel advised that her client would not agree to postpone the acquisition schedule. She further advised that the Government was unwilling to perform any type of survey to evaluate plaintiff's capabilities to manufacture the FMU–140/B fuze within particularized time and cost constraints.

This court then conducted a formal status conference on September 21, 1992. De-

fendant, again, rejected the court's recommendation to postpone the award and conduct a pre-award survey. Consequently, the court issued a bench ruling preliminarily enjoining the award to Motorola through October 31, 1992. This written opinion was to follow.

Upon full consideration of the parties' arguments, briefs, and supporting documentation, defendant's motion to dismiss is denied; this court finds that it does have subject matter jurisdiction over this suit for the reasons stated in *Standard Manufacturing Co. v. United States*, 7 Cl.Ct. 54 (1984).[1] Furthermore, the court finds that plaintiff has convincingly demonstrated the need for a preliminary injunction. The court's reasoning follows.

### Factual Background

The FMU–140/B is a sophisticated, electronic bomb fuze that is used in air-delivered munitions by the Navy. The fuze was developed by Motorola, Inc., (Motorola) in conjunction with the Department of the Navy (DON or Navy). The fuze was intended to replace an older fuze that required aircraft to fly very low over enemy targets to deliver weapons, subjecting the aircraft to intense ground fire. The FMU–140/B allows flexibility in delivery, including high altitude and loft tactics, thus improving weapon effectiveness and the chances of aircrew and aircraft survival.

Early in 1991, the Department of the Navy, through the Naval Air Systems Command (NAVAIR), began planning for an upcoming procurement of FMU–140/B fuzes. Responsibility for the FMU–140/B fuze and the procurement at issue in this case was transferred to the U.S. Army Armament, Munitions and Chemical Command, Rock Island, Illinois, (AMCOM or Rock Island) as the Single Manager for the Conventional Ammunition contracting agency. Consideration was given to the production capacity of the existing producer, Motorola, based upon confidential information provided by it. Additional informa-

tion was offered by Motorola on or about April 2, 1991. During the period between April 29 and May 3, 1991, the information provided by Motorola was verified by an on-site review, referred to as a Command Review of Industrial Base (CRIB) Survey, of its facility.

On April 29, 1991, NAVAIR sent a statement relating the urgency of the procurement to Leslee LaMere (Ms. LaMere), the Contracting Officer at Rock Island. On or about August 20, 1991, Ms. LaMere received the first procurement work directive concerning the FMU–140/B fuze; this document requested the procurement of certain units and announced the required delivery schedule, with deliveries beginning in January 1993. Ms. LaMere began preparation of a Justification and Approval (J & A), proceeding under the "only one responsible source" exception, 10 U.S.C. § 2304(c)(1) (Supp.1992), FAR 6.302–1, to procure the FMU–140/B fuzes. At that time, a technical data package (TDP) suitable for competition did not yet exist.

On December 12, 1991, Fred Taube (Mr. Taube), a Magnavox representative, met with Ms. LaMere and Jeanne Smith (Ms. Smith), who was, at that time, the AMCOM Competition Advocate. He informed them that Magnavox was interested in bidding on the procurement. He confirmed the company's intentions with a letter sent to Ms. Smith dated December 13, 1991. By a second letter, dated December 11, 1991, Magnavox's contract administrator, Larry Smith (Mr. Smith), requested a technical data package (TDP) for the fuze. The first time that a certified TDP became available for competition was on January 24, 1992. On February 6, 1992, Mr. Smith renewed his request for the TDP. AMCOM complied with neither of these requests.

On March 26, 1992, Stephen K. Conver, Army Senior Procurement Executive, approved the J & A for the sole-source procurement (from Motorola) of up to 31,194 total units of the FMU–140/B fuze. In the J & A, in addition to invoking the "only one

---

1. To the extent that defendant's motion is one for summary judgment, the court holds it in abeyance until it can be disposed of simulta- neously with plaintiff's cross-motion for summary judgment.

responsible source" exception at 10 U.S.C. § 2304(c)(1), Rock Island relied upon the grant of authority at FAR § 6.302–1(a)(2)(ii) that implements 10 U.S.C. § 2304(d)(1)(B).[2]

On or about April 2, 1992, a notice of market survey was published in the *Commerce Business Daily* (CBD). The notice stated, "[T]he purpose for this market survey is to solicit producers who have the qualifications/abilities to produce the FMU–140/B." [3] As a result of the market survey, Magnavox and three other producers expressed an interest in the FMU–140/B program. Of the producers responding, the agency determined that only Magnavox had the established expertise in the production of proximity type fuzes. On April 10, 1992, Magnavox responded to the market survey in a five page document outlining Magnavox's capabilities to produce the FMU–140/B fuze.

By internal memorandum dated April 23, 1992, Jack Jordan (Mr. Jordan), Contract Specialist, concluded, with the concurrence of Ms. LaMere, that while it was logical to conclude that Magnavox would be able to produce the FMU–140/B fuze, in light of its expertise in the production of proximity fuzes through its FZU–39/B program, differences between the two fuzes, such as, the degree of complexity (the FMU–140/B being more complicated), the addition of another electronic board in the FMU–140/B, the size of electronic boards, and the wiring and components existed. The memorandum concluded that "in regards to . . . delivery of an acceptable product in the time frame required by the customer, no accurate appraisal as to Magnavox's capabilities can be estimated without a Govern-

ment team (CRIB/Preaward Survey) physically going into the contractor's plant and assessing his capabilities."

On May 4, 1992, solicitation DAAA09–91–R–0924, for the FMU–140/B fuze, was issued to Motorola. On or about May 7, 1992, the Solicitation Review Board met and reviewed the solicitation. By this time, another change had been made in the quantities requested by the customer to 28,222 units. The review board recommended changes in the solicitation, including one concerning the number of units purchased and one deleting the "Waiver of First Article Approval" clause. Amendment 0001 to the solicitation was issued on May 14, 1992. It effected the changes necessitated by the change in quantities and the recommendations of the Solicitation Review Board. By letter dated May 28, 1992, Motorola requested an extension of the due date for its proposal, citing changes made by Amendment 0001. A second amendment to the solicitation, Amendment 0002, was issued subsequently extending the proposal due date to June 11, 1992. On June 11, 1992, Motorola timely submitted a proposal.

The next day, June 12, 1992, James M. Lonergan (Mr. Lonergan), a contracting officer supervised by Ms. LaMere, advised Magnavox that its April 10, 1992, submission in response to the market survey had been reviewed, the Government concluding that Magnavox would not be able to meet the required delivery date. Mr. Lonergan's letter also indicated that a certified TDP was available as part of the solicitation package should Magnavox "decide to request one." [4] On June 19, 1992, Magnavox again requested a copy of the TDP. Despite the issuance of solicitation DAAA09–

---

2. Section 2304(d)(1)(B) provides:

   For purposes of applying subsection (c)(1), in the case of a follow-on contract for the continued development of highly specialized equipment, or the continued provision of highly specialized services, such property or services may be deemed to be available only from the original source and may be procured through procedures other than competitive procedures when it is likely that award to a source other than the original source would result in: (i) substantial duplication of cost to the United States which is not expected to be recovered

through competition; or (ii) unacceptable delays in fulfilling the agency's needs.
10 U.S.C. § 2304(d)(1)(B) (Supp.1992).

3. This notice was a correction of an earlier notice, printed on or about March 16, 1992, which restricted the procurement of 13,792 units of the FMU–140/B fuze to mobilization base producers, the only one of which was Motorola.

4. On June 26, 1992, Ms. LaMere wrote Magnavox a letter identical to the June 12, 1992, letter written by Mr. Lonergan.

91–R–0924 to Motorola, Magnavox received the TDP and the request for proposal, RFP DAAA09–91–R–0924, from Ms. LaMere on July 9, 1992.

## DISCUSSION

In response to plaintiff's complaint and motion for preliminary injunction, defendant contends that the court should dismiss this case, pursuant to RUSCC 12(b)(1), for lack of subject matter jurisdiction. Plaintiff strongly objects to the motion to dismiss and maintains that it is entitled to a preliminary injunction, pursuant to RUSCC 65.

I. *Defendant's Motion to Dismiss.*

Defendant argues that the court should dismiss this case for lack of authority to grant the injunctive relief plaintiff seeks.[5] Defendant correctly states that the court's equitable jurisdiction is limited by the Federal Courts Improvements Act of 1982 (FCIA), 28 U.S.C. § 1491(a)(2), (3) (Supp. 1992). *Arrowhead Metals, Ltd. v. United States,* 8 Cl.Ct. 703, 711 (1985). Arguing that such jurisdiction extends only to cases where the Government breached an implied promise to fairly and honestly consider a contractor's "bid", in response to the Government's request for bids, defendant challenges the application of this court's equitable jurisdiction to cases where a contractor fails to submit, or was not requested to submit, a "bid". In other words, defendant contends that no implied-in-fact obligation on behalf of the Government manifests from a sole-source procurement because, by its nature, such a procurement does not allow solicited responses for a competitive bid.

Defendant rejects as "erroneous" this court's prior decision in *Standard Manufacturing.* In that case, the court found that an implied-in-fact contract was indeed created in the context of a sole-source procurement. As a result, the court concluded that it could grant equitable relief, even though the contractor was not a "bidder". *Standard Mfg. Co.,* 7 Cl.Ct. at 59–60. Defendant asserts that this ruling goes beyond Congress's intent in enacting the FCIA and that it thwarts binding precedent to the contrary. Defendant urges, instead, that the court follow the strict language of *ATL, Inc. v. United States,* 736 F.2d 677 (Fed.Cir.1984), that "[t]he implied-in-fact contract theory extends only to bidders." *Id.* at 682 n. 17; *see also United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1369 (Fed.Cir.1983) (specifically mentioning "bid protests" in discussing the FCIA sections at issue); *Harris Sys. Int'l, Inc. v. United States,* 5 Cl.Ct. 253, 260 (1984) (same).

Plaintiff argues that *Standard Manufacturing* is factually "on all fours" with the case at hand. Though plaintiff acknowledges that *ATL* and other precedent, rigidly applied, suggest that this court presently lacks jurisdiction, plaintiff points out forcefully that *Standard Manufacturing* reached its result by following, not defying, the reasoning in those prior decisions. *Standard Mfg. Co.,* 7 Cl.Ct. at 59–60.

*Standard Manufacturing* is non-binding precedent in the Claims Court since it was never ruled upon by the Court of Appeals for the Federal Circuit; however, this court finds its reasoning persuasive and, accord-

---

5. Defendant initially contends that the court lacks authority to issue the injunction because this case does not involve a claim for money damages, and, therefore, no jurisdiction exists pursuant to the Tucker Act. *United States v. King,* 395 U.S. 1, 2–3, 89 S.Ct. 1501–02, 23 L.Ed.2d 52 (1969). Defendant, however, misstates the applicable law. The language of 28 U.S.C. § 1491(a)(3) (Supp.1992), provides in part:

> To afford complete relief on *any* contract claims brought before the contract is awarded, the court shall have exclusive jurisdiction

to grant declaratory judgments and such equitable and extraordinary relief as it deems proper, including but not limited to injunctive relief.

(emphasis added.) Thus, § 1491(a)(3) is an exception to the money damages requirement. *See Coggeshall Dev. Corp. v. United States,* 23 Cl.Ct. 739, 743 n. 6 (1991); *Blount, Inc. v. United States,* 22 Cl.Ct. 221, 226 (1990); *Williams Int'l Corp. v. United States,* 7 Cl.Ct. 726, 730 n. 5 (1985). A keen awareness of RUSCC 11 should have discouraged assertion of this contention.

ingly, elects to follow its holding. As the court stated in *Standard Manufacturing:*

> When defendant, in furtherance of a Congressional mandate designed to enhance competition in federal procurement, published the required notice of its intent to procure MLTs on a sole-source basis, and invited interested persons "to identify their interest and capability to respond to such requirement, or to submit proposals in response to such notice", it necessarily if impliedly, "promised to give fair and impartial consideration ..." to any response to that notice. Plaintiff has here alleged its acceptance of the offer, and a breach by defendant of the resulting implied contract, and has thus stated a claim founded upon a contract with the United States, within the meaning of section 1491(a)(1) and section 1491(a)(3). 7 Cl.Ct. at 59 (quoting *Heyer Products Co. v. United States*, 135 Ct.Cl. 63, 69, 140 F.Supp. 409, 413 (1956)) (citations and footnotes omitted).

This court is convinced that the instant case is "on all fours" with *Standard Manufacturing.* The Government's CBD market survey notice and plaintiff's response resulted in an implied contract to give plaintiff's response fair and impartial consideration. *See id.* As in *Standard Manufacturing*, each of the elements necessary to find an implied-in-fact contract—mutuality of intent, offer, acceptance, consideration, and the agent's authority to bind the Government—exist here, as they did in that case. *See City of El Centro v. United States*, 922 F.2d 816, 820 (Fed.Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991). The CBD announcement in this case implied that the Government intended to consider proposals submitted in response thereto. *See Standard Mfg. Co.*, 7 Cl.Ct. at 59. This was an offer, albeit one required by statute. Plaintiff accepted this offer and provided sufficient consideration by responding with an extensive and detailed statement of interest. *See id.* The agent issuing the CBD announcement, not only had authority to do so, but was under an obligation to do so.

This court finds that plaintiff states a claim within the purview of this court's jurisdiction under 28 U.S.C. § 1491(a)(1), (3). Moreover, defendant's argument proves too much. Unless one in plaintiff's position is a "bidder", defendant argues, the Government has no implied obligation to act fairly and honestly. Defendant's contention falls outside the mandate of the CICA—that competition be fostered for the benefit of public interests.

## II. *Plaintiff's Motion for a Preliminary Injunction.*

■ In order to establish entitlement to a preliminary injunction, plaintiff must demonstrate four factors: (1) that it will suffer a specific irreparable injury if procurement is not enjoined; (2) that it is likely to succeed on the merits of its claim; (3) that the harm suffered by it, if the procurement is not enjoined, will outweigh the harm to the Government and third parties; and (4) that granting injunctive relief serves the public interest. *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed.Cir.1983). Plaintiff must prove each of these elements by clear and convincing evidence. *Baird Corp. v. United States*, 1 Cl.Ct. 662, 664 (1983).[6]

---

**6.** The court recognizes that many judges of the Claims Court have applied the "clear and convincing evidence" standard to each of the four elements for a preliminary injunction. Out of a desire to expeditiously issue its ruling, the court follows this standard. However, the court believes that a lesser standard is more compelling and more in line with what other jurisdictions, as well as several other judges of the Claims Court, apply. *Resolution Trust Corp. v. Elman*, 949 F.2d 624, 626 (2d Cir.1991); *Chez Sez III Corp. v. Township of Union*, 945 F.2d 628, 634 (3d Cir.1991), *cert. denied* —— U.S. ——, 112 S.Ct. 1265, 117 L.Ed.2d 493 (1992); *Hazardous* *Waste Treatment Council v. South Carolina*, 945 F.2d 781, 787 (4th Cir.1991); *Johnson Controls, Inc. v. Phoenix Control Sys., Inc.*, 886 F.2d 1173, 1174 (9th Cir.1989); *Frisch's Restaurant, Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985); *Asociacion Colombiana De Exportadores De Flores v. United States*, 916 F.2d 1571, 1575, 1578 (Fed.Cir.1990). This issue is ripe for resolution in this court. *See, e.g., Isratex, Inc. v. United States*, 25 Cl.Ct. 223, 227–28 (1992); *Logicon, Inc. v. United States*, 22 Cl.Ct. 776, 783 (1991); *Compliance Corp. v. United States*, 22 Cl.Ct. 193, 199 (1990), *aff'd*, 960 F.2d 157 (Fed.

A. *Plaintiff will suffer a specific irreparable injury if the procurement is not enjoined.*

Plaintiff argues that it will be irreparably injured if the procurement is not enjoined, because the restricted procurement assures a sole-source award to Motorola; that is, the procurement will deny plaintiff the opportunity to compete for the award and to have its proposal fairly considered. Thus, if the injunction is not issued, plaintiff maintains, it will lose the opportunity to compete altogether. Plaintiff asserts that this loss constitutes irreparable injury. *Isratex, Inc. v. United States,* 25 Cl.Ct. 223, 231 (1992).[7]

Defendant insists that plaintiff has misconstrued cases holding that a lost opportunity to compete constitutes irreparable injury. Defendant argues that *Isratex* involved a permanent, not a preliminary, injunction and that irreparable injury is not required for a permanent injunction. Rather, defendant contends, the parallel prerequisite for a permanent injunction is absence of an adequate legal remedy. Defendant concludes by insisting that in no case has the lost opportunity to compete been found sufficient cause for a preliminary injunction.

The court is not swayed by defendant's argument that *Isratex* is distinguishable. Although the court in that case found the absence of a legal remedy, it specifically noted that the claimant also alleged irreparable harm. In that case, Isratex, Inc. (Isratex) brought an action to prevent the award of a contract to a competitor, alleging that the Government was proceeding with the award without properly considering other sources. The court held that Isratex would be irreparably harmed, absent injunctive relief; since, in an action at law, it could only recover bid preparation costs. *Isratex, Inc.,* 25 Cl.Ct. at 231. The situation in the present case, as well, demonstrates convincingly that plaintiff will suffer irreparable injury if the court does not enjoin the procurement.

Defendant's contention that no case has ever held that the lost opportunity to compete is irreparable injury, for purposes of a preliminary injunction, lacks merit. In *TRW Envtl. Safety Sys., Inc. v. United States,* 16 Cl.Ct. 520 (1989), the court held:

> [A] plaintiff moving for [a] preliminary injunction need only allege, in order to establish irreparable injury, that by failing to enjoin, it will not be awarded the contract and will lose profits thereunder. [This is] based upon the proposition that an unsuccessful bidder's damages are limited at law to bid preparation costs.

*Id.* at 529 (citations omitted). Denial of the opportunity to obtain the present contract and the profits derived therefrom is precisely what plaintiff refers to when alleging its "lost opportunity to compete". This is an irreparable injury. *See Quality Transp. Servs., Inc. v. United States,* 12 Cl.Ct. 276, 282 (1987); *Essex Electro Engrs., Inc. v. United States,* 3 Cl.Ct. 277, 287 (1983).

Without an equitable remedy, the only relief which could be granted to a bidder would be damages in the amount of bid preparation costs. Such a limited remedy is insufficient to compensate an injured bidder for the harm suffered due to a breach of an implied contract. *Quality Transp. Servs., Inc.,* 12 Cl.Ct. at 282. The present case is even more compelling, in this respect, since the plaintiff has no bid preparation costs. If plaintiff is denied injunctive relief, it will effectively be denied any re-

---

7. The parties also discuss the Claims Court's decision in *Arthur Forman Enters., Inc. v. United States,* 22 Cl.Ct. 816 (1991). This decision was vacated by the United States Court of Appeals for the Federal Circuit. *Arthur Forman Enters., Inc.,* 960 F.2d 154 (Fed.Cir.1991). Each party's attentiveness to details should have precluded improper citation to the case.

Cir.1992); *Quality Transp. Servs., Inc. v. United States,* 12 Cl.Ct. 276, 281–82 (1987); *DLM & A, Inc. v. United States,* 6 Cl.Ct. 329, 331 (1984) (standard of proof is "strong likelihood of success on the merits".); *but see Bean Dredging Corp. v. United States,* 22 Cl.Ct. 519, 522 (1991); *Baird Corp.,* 1 Cl.Ct. at 664. This court favors the standard applied in *TRW Envtl. Safety Sys., Inc. v. United States,* 16 Cl.Ct. 520, 526 (1989) (citing *Litton Systems, Inc. v. Sundstrand Corp.,* 750 F.2d 952, 956 (Fed.Cir.1984)).

lief. Therefore, plaintiff would be irreparably harmed. *See id.*

Plaintiff adds that it will suffer further irreparable injury, in the form of a lost ability to compete for future related fuze procurements, if the award is not enjoined. Plaintiff claims that receiving the production contract for the FMU–140/B will enable it to maintain the viability of its related proximity fuze line, including the FZU–39/B fuze, which will be the subject of future procurements; while failure to receive the contract award would lessen plaintiff's production viability. Defendant, on the other hand, contends that a reduced ability to compete for future procurements is uncertain and too speculative to constitute irreparable injury.

Though it is conceivable that plaintiff's competitiveness could be reduced as a result of defendant's alleged breach of contract,[8] plaintiff fails to establish this particular injury by clear and convincing evidence.

B. *Plaintiff is likely to succeed on the merits of its claims.*

Plaintiff argues that the Government violated its own regulations governing sole-source procurements, and that these violations prejudiced plaintiff by excluding it from competing for a significant contract. Adding that procurement officials lack the discretion to violate such regulations, plaintiff goes a step further, arguing poignantly that the Government lacked a reasonable basis for its decision to make a sole-source award. Plaintiff urges that the Government's violations of the pertinent regulations and its failure to cite a reasonable basis for its decision entitle plaintiff to injunctive relief.

Defendant argues that a sole-source procurement is authorized by 10 U.S.C. § 2304(c)(1), because "the property ... needed by the [Navy] [is] available from only one responsible source and no other type of property ... will satisfy the needs of the [Navy]." *Id.* Defendant also argues that, since the procurement at issue is a "follow-on contract for the continued de-

velopment or production of highly specialized equipment," it acted under the authority of FAR § 6.302–(1)(a)(2)(ii), which implements 10 U.S.C. § 2304(d)(1)(B) (Supp. 1992). In such cases, defendant points out, procurement, on a noncompetitive basis, from the original source is permitted where the agency determines that it is likely that: (1) an award to another source would result in substantial duplication of costs to the Government, which would not be recovered through competition; or (2) competition would result in unacceptable delays in fulfilling the agency's needs. *Id.* Accordingly, defendant concludes, if its J & A is rationally supported by a contemporaneous finding that either the costs associated with competition would have substantially outweighed those associated with the sole-source procurement, or that competition would have resulted in unacceptable delays, this court must sustain the agency's decision to award the contract to Motorola.

■ The scope of review of procurement decisions is "extremely limited." *RADVA Corp. v. United States,* 17 Cl.Ct. 812, 818 (1989), *aff'd,* 914 F.2d 271 (Fed.Cir. 1990) (quoting *CACI Field Service, Inc. v. United States,* 13 Cl.Ct. 718, 725 (1987)). In order to demonstrate a violation of the Government's duty to consider all bids for Government contracts fairly and honestly, a contractor must prove that the Government acted arbitrarily and capriciously. *Excavation Constr., Inc. v. United States,* 204 Ct.Cl. 299, 302, 494 F.2d 1289, 1290 (1974). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); *Skytech Aero, Inc. v. United States,* 26 Cl.Ct. 251, 254 (1992).

■ This court is not concerned with whether the contracting officer's decision to proceed with a sole-source procurement was "right" or "wrong". "The court

---

**8.** For example, in the case at bar, plaintiff's experience in producing the FZU–39/B fuze increases the likelihood that it can become a source for the FMU–140/B fuze.

should not substitute its judgment on such matters for that of the agency, but should intervene only when it is clearly determined that the agency's determinations were irrational or unreasonable." *Baird Corp. v. United States,* 1 Cl.Ct. 662, 664 (1983). This court has set forth four factors which should be considered before finding arbitrary and capricious conduct on behalf of the Government: (1) the existence of subjective bad faith on the part of the Government officials; (2) the absence of a reasonable basis for the administrative decision; (3) the amount of discretionary authority entrusted to the procurement officials by applicable statutes and regulations; and, (4) the proven violation of pertinent statutes or regulations. *Keco Indus., Inc. v. United States,* 203 Ct.Cl. 566, 574, 492 F.2d 1200, 1203 (1974). *See Logicon, Inc. v. United States,* 22 Cl.Ct. 776, 782 (1991) ("A frustrated bidder may obtain injunctive relief if it establishes either that the agency's actions were without a reasonable basis, or that a clear and prejudicial violation of an applicable procurement statute or regulation occurred.").

As support for its position that defendant's conduct was unreasonable and violated the relevant procurement regulations, plaintiff relies on *Businessland, Inc.,* 86–3 BCA ¶ 19,288 (GSBCA) [hereinafter *Businessland II*], *aff'g Businessland, Inc.,* 86–3 BCA ¶ 19,268 (GSBCA 1986) [hereinafter *Businessland I*]. The General Services Board of Contract Appeals (the Board) held that a Government agency violated procurement regulations in awarding a sole-source contract when it failed to make further inquiry of Businessland, Inc. (Businessland) which had expressed an interest in obtaining the contract. *Id.*

Defendant urges the court to reject the Board's reasoning in the two *Businessland* decisions, because their underlying facts did not involve a follow-on contract. Defendant relies on the following statement in *Businessland II*:

The law expressly recognizes the propriety of sole source awards when the time required for competition would result in unacceptable delays in fulfilling the agency's needs. It does so, however,

only in the case of a follow-on contract for the continued development or production of a major system or highly specialized equipment. 41 U.S.C. § 253(d)(1)(B). This of course is not such a case.

*Id.,* 86–3 BCA at 97,420. Therefore, defendant contends, *Businessland I* and *II* stand not for the finding that the contracting officer failed her duty to make reasonable determinations and justifications, but for the conclusion that she relied upon an inapplicable justification—unacceptable delays.

The *Businessland* decisions involved a contract for providing computer services to the Government's General Services Administration (GSA). The GSA proceeded under the "only one responsible source" exception to full and open competition, and extended the contract with its incumbent supplier, MBI Business Centers, Inc. (MBI) on June 26, 1986. But, prior to the contract being extended, Businessland submitted, in response to a CBD notice, a detailed statement of its interest and capabilities for the contract. The contracting officer reviewed the submission and concluded that Businessland "had [not] provided enough information to determine that [it] could meet the Government's minimum mandatory requirements." *Businessland I,* 86–3 BCA at 97,417. The CBD notice, however, failed to indicate that such detailed information was required, requesting only that those responding identify their interest and capabilities. Nevertheless, the contracting officer determined that "[Businessland] had not indicated a capability to meet the Government's requirements generally, ... and that it was therefore not in the Government's best interest to conduct a competitive procurement for the extension period." *Id.*

On review, the Board, in *Businessland I,* began its analysis by noting that "[b]y statute, an agency must achieve full and open competition when awarding any contract unless it properly justifies proceeding otherwise under at least one of the seven exceptions; *full and open competition is the standard, not the exception.*" *Id.* at 97,421 (emphasis added). The Board determined that only two of the exceptions

might be applicable: the "only one responsible source" exception and the "unusual and compelling urgency" exception. *Id.* The Board found that the contracting officer failed to demonstrate an "unusual and compelling urgency;" therefore, it held that the "unusual and compelling urgency" exception was inapplicable. The Board also found that the "only one responsible source" exception was inapplicable, because the contracting officer failed to make further inquiry of Businessland. *Id.*

With respect to the latter finding, the Board reasoned that the contracting officer improperly determined that Businessland was nonresponsible because it could not complete the contract in a timely fashion. *Id.* at 97,423. The Board observed that the contracting officer failed to seek further information regarding the Businessland's capabilities, and that the company provided insufficient information for a determination of responsibility. *Id.* The Board admonished, "Thus, for the contracting officer to conclude that [the incumbent contractor] was the only responsible source available to satisfy the Government's requirements was premature, at best, clearly unreasonable, and possibly erroneous." *Id.*

In *Businessland II,* the Board reconsidered the case to examine the respondent's suggestion that a "duty of further inquiry", on behalf of the contracting officer, was not required by the regulations. *Businessland II,* 86–3 BCA at 97,514. The Board first recognized that the pertinent statutes and regulations constituted more than a "superficial, perfunctory mechanism for justifying sole-source procurements." *Id.* It reiterated its discussion of the contracting officer's failure to seek information from the protestor, which was necessary to determine Businessland's responsibility. *Id.* Concluding, the Board held:

> It was the contracting officer's responsibility not to proceed on a sole-source basis until after she ascertained by a reasonable inquiry into the protestor's capability that it was not a source, and that only one responsible source actually existed to fulfill the respondent's needs.

> Her failure to make that inquiry was unreasonable and arbitrary.

*Id.*

The factual background in the case at bar is analogous to that related in the two *Businessland* decisions. Defendant's attempt to distinguish the facts in *Businessland I* and *II,* because the circumstances did not involve a follow-on contract, misses the point. Procurement and contracting officers have a duty to follow Government statutes and regulations. The officer's obligation in this case, as in the *Businessland* proceedings, was to make certain determinations and justifications, mandated by statutes and regulations, upon reasonable bases. The two *Businessland* decisions aside, if this court finds, for purposes of imposing a preliminary injunction, that plaintiff casts strong doubt on defendant's justifications for the sole-source award, then plaintiff has a strong likelihood of success on the merits. *See supra* note 6; *but see Quality Transp. Servs., Inc.* 12 Cl.Ct. at 276–77 (The court found that a movant is not required to prove a strong likelihood of success by clear and convincing evidence.).

Defendant alleges, first, that the sole-source award is justified by Rock Island's analysis of the costs that would be incurred by other sources to develop and produce the FMU–140/B fuze. The J & A, dated March 26, 1992, summarizes and references a detailed cost-benefit study by the Navy that identifies the costs that will be duplicated if another source produces the FMU–140/B. Rock Island adopted the DON's conclusion that between $3.5 and $7.5 million in costs would not be recovered through competition. Defendant's second allegation justifying the sole-source award—that competition would result in unacceptable delays—also relies on Rock Island's analysis. The analysis concluded that Motorola was more likely than plaintiff to produce the FMU–140/B fuzes without unacceptable delays in fulfilling the Government's needs. Given a required delivery date for the fuzes of January 30, 1993, a date selected in light of the DON's request that the procurement be expedited

to the greatest degree possible due to the limited effectiveness of the current fuzes, Rock Island determined, based upon a review of Motorola's recent production capacity for the fuze, that Motorola could comply with the increased production delivery schedule. Rock Island also concluded that plaintiff could not meet the production delivery schedule required, because it would experience design and production problems, as well as problems in initial first article testing, similar to those experienced by Motorola during development of the fuze. In the J & A, Ms. LaMere estimated that plaintiff would not be in a position to make production quantity deliveries to the Government until the end of 1993.

Focusing further on the J & A, the Government stated therein that it was "unlikely" that any source, other than Motorola, could meet the award requirements. Nevertheless, in a memorandum prepared by the procurement officials, the Government stated that:

> [I]n regards to submittal/passing of FAT requirements as well as delivery of an acceptable product in the time frame required by the customer, *no accurate appraisal as to Magnavox's capabilities can be estimated without a Government team (CRIB/preaward survey) physically going into the contractor's plant and assessing his capabilities.*

Memorandum for Record by Jack Jordan, concurrence by Leslee LaMere, Administrative Record, Tab 35, April 23, 1992 (emphasis added). The record reveals that the Government failed to follow up on its own conclusion that no accurate appraisal could be made of Magnavox's production capabilities, with respect to the FMU–140/B fuze, without a preaward survey. FAR 9.106–1 states that normally a pre-award survey is required "when the information on hand or readily available to the contracting officer is not sufficient to make a determination regarding responsibility."[9] It follows, then, that the Government's conclusion, that no contractor other than Motorola

could satisfy the award requirements, was without an articulated reasonable basis.

■ This court is extremely concerned that the Government's decision to proceed on a sole-source procurement, without further investigating plaintiff's capabilities by conducting a pre-award survey, was unreasonable and a violation of regulations. Although the *Businessland* decisions are not directly on point, the Board's language in *Businessland I* is, nevertheless, instructive:

> [W]ithout having sought further response from the protestor, based on its submission in accordance with the CBD notice, [the Government] could not sufficiently determine that only one responsible source could satisfy its needs. To reach such a conclusion based upon [the contractor's] response is simply unreasonable. While a contracting officer has much discretion regarding the conduct of a procurement, she may not cavalierly violate statutes and regulations. Determinations and justifications were called for; however, no complying determinations and justifications were provided.

*Businessland I,* 86–3 BCA at 97,421. Here, the Government made certain determinations necessary to allow it to proceed with a sole-source award; those determinations, however, appear to be, especially in light of the procurement officials' own admissions, based upon little more than speculation. *See* Memorandum for Record by Jack Jordan, concurrence by Leslee LaMere, Administrative Record, Tab 35, April 23, 1992. A mere attempt "to create an illusion of compliance with statutes and regulations" will not suffice. *Businessland II,* 86–3 BCA at 97,511. For purposes of preliminarily enjoining the contract award, this court is convinced of the likely success on the merits of plaintiff's claims.

C. *Harm to be suffered by plaintiff outweighs harm to Government and third parties.*

Plaintiff argues that the harm it will suffer, if a preliminary injunction is not

---

**9.** The Government urges that, although, under the regulations, a preaward survey would *normally* be required to make a determination of responsibility, a sole-source procurement involving unacceptable delay is not the normal case. This argument is not persuasive as it begs the question of whether it was proper for the Government to utilize the sole-source exception—precisely the question this court is attempting to resolve.

imposed, far outweighs the harm to the Government or any third parties. It asserts that the resulting delay would not unreasonably delay the procurement process and would allow the court time to carefully consider and address the merits of this case. Further, plaintiff observes that there is no stated urgency in the solicitation; indeed, the procurement has been proceeding at a leisurely pace. Finally, plaintiff argues that the history of the procurement is evidence that further delay will not harm the Government; the Navy first sought the procurement in Spring of 1991, but the request for production (RFP) was not issued until May 1992—one year later.

Defendant responds that delaying procurement of the FMU–140/B fuzes will jeopardize the lives of air crews and impair the effectiveness of aircraft in operations. The defendant also represents that the current lack of assets severely degrades combat readiness by limiting the war-fighting capability of United States Navy forces.

The court is mindful of the fact that 28 U.S.C. § 1491(a)(3), which authorizes the injunctive relief plaintiff requests, concludes with the admonition that, "[i]n exercising this jurisdiction, the court shall give regard to the interests of national defense and national security." *Id.* However, such interests are not an impenetrable shield behind which defendant can hide when it wishes to avoid procurement regulations. *See Essex Electro Engrs., Inc.,* 3 Cl.Ct. at 288. Furthermore, the court acknowledges that Motorola may be harmed if the procurement is enjoined, since it must hold resources in limbo pending a final resolution of this case.

■ Recognizing the importance of the procurement at issue to the DON and Motorola, this court, nevertheless, finds plaintiff's showing of the harm it will suffer, if the preliminary injunction is not issued, convincing. In contrast, defendant shows little to support its assertion that significant harm is imminent if the procurement is enjoined. This is not to say that defendant's suggestion, that people's lives are appreciably at risk, has gone unnoticed or without painstaking consideration; such a suggestion demands no less of this court. This court has strained, however, to find convincing evidence in the record to support either defendant's claim that the Government will suffer significant harm, or that circumstances are such that lives are at stake. By defendant's own admission, the urgency of the procurement has subsided since 1991.[10] Furthermore, this court is confident that any delay resulting from a preliminary injunction will be short-lived; the parties' cross-motions for summary judgment, currently under consideration, could dispose of this matter soon, or an expedited trial may be held to resolve this suit. *See Isratex, Inc.,* 25 Cl.Ct. at 231. The harm caused by such a minimal delay in the procurement is outweighed by the harm plaintiff will suffer if it is illegally and unreasonably denied fair and honest consideration for the contract award. *Id.*

### D. *Granting the Injunction serves the public interest.*

■ In concluding, plaintiff argues that an injunction would serve the public interest by maintaining the *status quo* until the court can decide the merits of this case. Plaintiff argues forcefully that violations of procurement statutes and regulations negatively impact the integrity of the entire procurement process. Plaintiff further argues that an injunction may allow it an opportunity to compete, which would provide the Government a competitive price on a quality product within the anticipated delivery schedule. Finally, if plaintiff were to receive the award, the mobilization base for the fuze would be expanded, which would further serve the public interest.

---

**10.** "[Originally,] the procurement was to be accomplished by exercising an option to an existing contract with the only qualified producer, Motorola. Just prior to the award of the option, Desert Storm came to an end. Even though the urgency of Desert Storm is no longer present, the requirement for the FMU–140 fuzes still exists as Naval and Marine Corp units continue to forward deploy to war zones in support of National Policy." Statement of Captain R.L. Ramsay, Department of the Navy (DON), Administrative Record, Tab 3, April 29, 1991.

Defendant contends that the public interest is coextensive with defendant's interest to avert risks to aircrew, equipment, and military operations. Defendant urges that delaying the procurement of the FMU–140/B fuze will implicate substantial security and defense needs, and thereby, unduly harm the public interest. Defendant also asserts that, under the sole-source procurement, the costs to the Government, and therefore to the public, are less than if plaintiff is allowed an opportunity to compete.

This court previously considered defendant's interest in national security and found it unsubstantiated compared to the potential harm plaintiff demonstrated. Also, the court previously addressed defendant's contention that costs will be lower under the sole-source procurement and determined that no reasonable assessment of costs has been made. Finally, the court rejects defendant's notion that its interests are coextensive with the public interest. Although plaintiff has not alleged that bad faith motivated the procurement officials in this case, history is rife with situations in which public officials pursued courses of action which were clearly not in the public interest. In order to ensure that procurement officials kept the public interest in mind—by preserving the integrity of the procurement process and promoting competition for Government contracts—Congress passed the Competition in Contracting Act. *See Isratex, Inc.*, 25 Cl.Ct. at 231; *Logicon, Inc. v. United States*, 22 Cl.Ct. 776, 795–96 (1991). Issuing a preliminary injunction will further these overriding and predominating public concerns.

## CONCLUSION

The Government urges the court to judge the decision of the contracting officer based on what was done at the time the decision to issue the sole-source award was made. This court has endeavored to remain focused on this issue. Nevertheless, this court finds it virtually inconceivable how defendant can contend the procurement officials made a reasonable decision when the record establishes that the same officials concluded "no accurate appraisal" of plaintiff's capabilities could be made without further inquiry. Defendant simply should have made further inquiry of plaintiff's capabilities to comply with the Government's needs: Blinders may be helpful to racehorses, but they are bane to Government procurement officials.

Shortly after the issuance of the court's bench ruling, on September 21, 1992, the parties jointly advised the court that they reached an agreement; the Government would conduct, and plaintiff would participate in, a survey evaluating plaintiff's capabilities to perform the terms of the contract.[11] The survey was completed on September 30, 1992, but the court has not yet been advised of the results of the survey. These circumstances, however, do not change the court's prior determination that the issuance of the preliminary injunction was legally justified, based on all the facts presented and the above cited legal precedents. Consequently, this opinion confirms issuance of the preliminary injunction. Unless extended by the court in a subsequent order, the injunction is effective through October 31, 1992.

In light of the completed survey, the parties shall file a joint status report advising the court of any agreement reached respecting the issues presented. Should the parties reach no agreement, the court will immediately schedule a status conference to discuss the need for extension of the preliminary injunction to permit the court additional time to rule on all then pending motions.

Defendant's motion to dismiss is denied, and the sole-source procurement is enjoined until October 31, 1992.

---

**11.** The parties indicated that something less than a pre-award survey would be conducted. Though this court has no authority to compel defendant to conduct a pre-award survey, as the statutes and regulations provide for, it is this court's opinion that the facts of this case require no less and no more of such a survey.