**Stephen J. GARCHIK, David W. Evans and the Evans Company, Stafford Place Associates II, L.P., and Square 46 Associates, L.P., Plaintiffs,**

v.

**UNITED STATES, Defendant.**

No. 96–98C.

United States Court of Federal Claims.

Dec. 2, 1996.

Timothy F. Brown, McLean, Virginia, for plaintiffs.

Donald E. Kinner, Civil Division, Department of Justice, Washington, D.C., with whom was Frank W. Hunger, Assistant Attorney General, and David M. Cohen, Director, for defendant.

## OPINION

MARGOLIS, Judge.

This case, a pre-award bid protest by Stephen J. Garchik, David W. Evans, the Evans Company, Stafford Place Associates and Square 46 Associates (hereinafter "Garchik" or plaintiffs), is one of several lawsuits filed in this court challenging the efforts by the defendant, the United States, acting through the Securities and Exchange Commission, (hereinafter "SEC" or "Commission"), to lease commercial office space to house the Commission's headquarters staff. The case is currently before the court on defendant's motion for summary judgment. Defendant argues that because the government never requested and plaintiffs never submitted a formal "bid" during the SEC's sole-source procurement of a headquarters lease, there is no implied-in-fact contract between plaintiffs and the Commission that would permit this court to exercise its equitable jurisdiction. Plaintiffs respond that a formal bid is not required to form an implied-in-fact contract. Instead, plaintiffs argue, an implied-in-fact contract was created when plaintiffs responded to a market survey that was conducted by the SEC in connection with the sole-source procurement. Alternatively, plaintiffs argue that this court has jurisdiction over the case by virtue of a previous order by this court in *Triangle MLP Limited Partnership v. United States*, No. 95–430C, an earlier dispute involving the SEC's attempts to procure a headquarters lease.

After carefully considering the parties' written briefs and oral argument, the court concludes that an implied-in-fact contract was not created when plaintiffs responded to the Commission's market survey. Therefore the court lacks jurisdiction to hear Garchik's claim. In addition, the court finds that the *Triangle* order cannot serve as a separate basis for this court to exercise jurisdiction over the present dispute. Accordingly, the government's motion for summary judgment is granted.

## FACTS

The present controversy can be traced back to August 1994, when the Securities and Exchange Commission first issued a Solicitation For Offers (SFO) for commercial office space to house the Commission's headquarters staff. The August 1994 SFO indicated that the SEC intended to lease 550,000 to 600,000 net usable square feet of office space in the Washington, DC metropolitan area for a term of 20 years. Although the Commission received numerous proposals from interested property owners throughout the Washington area, the SFO was suspended in May 1995 after the General Services Administration ordered a government-wide "time out" review of all federal leasing activity. The purpose of this time out was to allow agencies such as the SEC to evaluate their long-term leasing strategies in light of the recent trend in government downsizing and the executive branch's "Reinventing Government II" initiative.

After conducting the mandated "time out" review, the SEC determined that its leasing needs could best be satisfied by remaining in the Commission's existing downtown Washington, DC headquarters under a short-term lease. According to the SEC's Contracting Officer ("CO") for the headquarters lease, Kenneth Fogash, the Commission's decision to pursue a short-term lease extension was dictated by "continuing budgetary constraints and uncertainty" within the SEC, as well as "the government-wide downsizing policy." In addition, the Commission's decision was influenced by a desire to avoid disruption of employees' short term commut-

ing patterns.[1] Based on these considerations, the SEC cancelled the August 1994 SFO and began to proceed with a sole-source procurement to extend the Commission's existing headquarters lease for an additional five-year term.

On January 2, 1996, the SEC published a notice in the *Commerce Business Daily* ("CBD") and several Washington-area newspapers indicating the Commission's intent to enter into a sole-source lease with its current landlord, Judiciary Plaza Limited Partnership ("JPLP"). Unlike the August 1994 SFO, which specified a twenty-year lease term, the January 1996 CBD Notice indicated that the SEC intended to enter into a five-year lease, to commence January 1, 1998, with an option to terminate on eighteen months notice any time after January 1, 1999. Additionally, while the 1994 SFO invited proposals from property owners throughout the entire Washington, DC metropolitan area, the January 1996 CBD Notice indicated that the SEC was only interested in leasing property located within a narrowly-defined geographic area in downtown Washington, DC. Specifically, the CBD Notice declared that "[t]he Space must be within the following delineated area: Bordered by K Street, NW/NE to the North; Second Street, NE, to the East; Southeast–Southwest Freeway, to the South; and Twentieth Street, to the West." The notice also specified that the property "must be [located] within 1750 walkable linear feet of a metrorail stop."

In addition to providing a synopsis of the Commission's leasing requirements, the January 1996 CBD Notice also invited proposals from interested property owners who were capable of satisfying the Commission's specified lease requirements. As required by procurement regulations and statutes, this invitation for proposals was intended solely to assist the Contracting Officer in conducting a "market survey" of potential sources before entering into the proposed sole-source contract with JPLP. *See* 41 U.S.C. § 253; FAR Subparts 5.2, 6.3. The CBD Notice made clear that the Commission's notice of intent

and request for proposals was "not a request for competitive proposals.... Information received will normally be considered solely for the purpose of determining whether to conduct a competitive procurement."

The Commission received a total of four responses to the CBD Notice, including a response from plaintiffs that was submitted to the SEC on February 29, 1996. In their response, plaintiffs proposed to construct and lease to the SEC a commercial office building in the Stuart Park office project in Arlington, Virginia. The plaintiffs' proposal specified that the space would be leased to the SEC for a ten-year term with "the option to terminate the lease at the end of five years, upon eighteen months advance notice, for a termination price of $4 million."

Although the three "non-plaintiff" proposals were determined to be within the geographic area specified in the CBD Notice, the SEC rejected each of the non-plaintiff proposals for various reasons. One response was rejected because it proposed housing the SEC in multiple buildings, while the CBD Notice invited proposals for a single structure. Another response was rejected because it contained insufficient information. The third and final non-plaintiff response was rejected because of "uncertainty" and "unacceptable financial and timeliness risks to the SEC" associated with the respondent's proposed construction schedule. After determining that none of the responses to the CBD Notice satisfied the Commission's short-term leasing needs, the CO concluded that there was no "reasonable prospect of competition if the SEC sought to procure ... its headquarters office space requirement" through competition rather than sole-source procurement.

Plaintiffs' response to the CBD Notice was rejected by the SEC for three primary reasons. First, the SEC informed Garchik and the other plaintiffs that the Stuart Park property did not present a viable source because it is located in Arlington, Virginia, well "outside the SEC's delineated area as published in the Commerce Business Daily."

---

1. In an internal survey of SEC employees that was conducted in the summer of 1994, the Commission apparently found that a large majority of

the Commission's employees "clearly preferred to remain in the District of Columbia."

Second, the SEC indicated that plaintiffs' response was unacceptable because the proposed "ten year lease term did not meet the CBD requirement for a five year term." Similarly, plaintiffs' proposal to allow the SEC to terminate the lease after five years, with a $4 million penalty, did not comport with the termination provision specified in the CBD Notice. Finally, plaintiffs' proposal was rejected because the Commission found that "the Stuart Park property does not have an existing structure that meets the SEC requirement. The financial and timeliness risks to the SEC entailed by constructing and building out a property are too great for the short term of the requirement, and are unacceptable."

On December 20, 1995—before the present case was filed, and even before the SEC published its CBD Notice indicating its intent to extend the existing headquarters lease—some of the plaintiffs filed a protest with the General Accounting Office challenging the SEC's decision to proceed with a sole-source procurement. Plaintiffs' GAO protest was voluntarily dismissed on February 20, 1996, however, and their original complaint seeking declaratory and injunctive relief was filed in this court on the same day. An amended complaint was filed on February 29, 1996 to reflect the fact that some of the named plaintiffs had submitted a proposal to the SEC in response to the CBD Notice. In their complaint, plaintiffs allege, first, that the Commission violated the Competition in Contracting Act ("CICA") by imposing baseless geographic and time restrictions on its lease requirements to justify a sole-source procurement; second, that the Commission's use of sole-source procurement procedures in this case violates CICA's full and open competition requirements; and finally that, even if otherwise legal, the SEC's current actions are tantamount to an illegal price auction because the Commission impermissibly disclosed source selection information in conducting the disputed sole-source procurement.

## DISCUSSION

Defendants have moved for summary judgment on the grounds that this court lacks jurisdiction to hear plaintiffs' claim. Specifically, the government argues that because plaintiffs never submitted a formal bid to the government, there is no implied-in-fact contract of fair and honest dealing that would permit this court to exercise jurisdiction under the Tucker Act, 28 U.S.C. § 1491. Plaintiffs argue that an implied-in-fact contract was created when plaintiffs submitted a proposal in response to the SEC's CBD Notice, and therefore the court has Tucker Act jurisdiction over the present dispute. Alternatively, plaintiffs argue that the court has jurisdiction over this case by virtue of this court's order in an earlier challenge to the SEC's procurement of a headquarters lease.

### A. Jurisdiction Under the Tucker Act

■ The jurisdiction of the Court of Federal Claims was established by Congress in the Tucker Act, 28 U.S.C. § 1491, which provides that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded ... upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1) (1996). This statutory grant of jurisdiction encompasses lawsuits, such as the present case, that "challeng[e] the proposed award of contracts based on alleged improprieties in the procurement process." *Central Arkansas Maintenance, Inc. v. United States,* 68 F.3d 1338, 1341 (Fed.Cir.1995). As the Federal Circuit explained in *Central Arkansas,* "[j]urisdiction in these cases arises from an alleged breach of an 'implied contract to have the involved bids fairly and honestly considered.'" *Id.* (quoting *United States v. John C. Grimberg Co., Inc.,* 702 F.2d 1362, 1367 (Fed.Cir.1983)).

■ In the present case, the government argues that there is no implied-in-fact contract between plaintiffs and the government because the government never requested and plaintiffs never submitted a formal bid. As a result, the government argues, Garchik's claim falls outside of this court's Tucker Act jurisdiction. In support of this argument, the government relies primarily on *Motorola, Inc. v. United States,* 988 F.2d 113 (Fed.Cir. 1993). In *Motorola,* the Federal Circuit adopted a decision by Judge Wiese of the

Court of Federal Claims holding that unless a contractor has submitted a formal bid to the government, there is "no basis for finding the existence of a pre-award contract upon which a claim for injunctive relief can be based." 988 F.2d at 116.

Despite the Federal Circuit's holding in *Motorola*, Garchik argues that an implied-in-fact contract of fair and honest dealing was created when plaintiffs responded to the Securities and Exchange Commission's January 1996 CBD Notice. To support this argument, Garchik relies on two cases from the former Claims Court—*Standard Manufacturing Co., Inc. v. United States*, 7 Cl.Ct. 54, 59 (1984), and *Magnavox Electronic Systems Co. v. United States*, 26 Cl.Ct. 1373, 1378 (1992)—which both squarely held that a contractor's response to an agency's notice of intent to conduct a sole-source procurement does, indeed, create an implied-in-fact contract between contractor and agency. Although *Standard* and *Magnavox* were extensively criticized in *Motorola*, Garchik argues that Judge Wiese's criticism of those two cases was mere *dicta*, *i.e.*, was not necessary to the disposition of the case in the Court of Federal Claims, and therefore this aspect of the decision was not adopted by the Federal Circuit. For the reasons set forth below, the court concludes that Garchik's interpretation of the case law is incorrect, and that *Standard* and *Magnavox* were both implicitly overruled by the Federal Circuit's decision in *Motorola*. 988 F.2d at 116. Consequently, Garchik's claim must be dismissed.

*Motorola*, like the current controversy, concerned a pre-award bid protest by a "non-bidder." In *Motorola*, the government invited companies in the defense electronics industry to participate in the development of specifications for an expected procurement of certain electronic devices. 988 F.2d at 114. As a result of an informal dialogue with Motorola and other firms in the industry, the government eventually developed technical specifications and initiated a formal solicitation for technical proposals. *Id.* at 114. Although Motorola had participated in the development of specifications, however, the company refused to respond to the government's formal solicitation of proposals. *Id.*

at 114–15. Instead, Motorola filed suit in the Court of Federal Claims in an effort to enjoin the solicitation. *Id.* at 115.

The government moved to dismiss the case on the same grounds asserted by the government here—namely, that the court lacked subject matter jurisdiction because Motorola had not submitted a formal bid. *Id.* at 115. In granting the government's motion to dismiss Motorola's claim, Judge Wiese of the Court of Federal Claims held that the court lacked subject matter jurisdiction because "Motorola's grievance [was] not founded on a contract." *Id.* The court rejected Motorola's contention that the company's communication with the government during the development phase created an implied-in-fact contract of fair and honest dealing analogous to the implied-in-fact contract created by submission of a formal bid. *Id.* at 115–16. In reaching this conclusion, Judge Wiese *specifically* noted his departure from *Standard Manufacturing*, which held that a contractor's response to an agency's market survey created an implied-in-fact contract of fair and honest dealing. *Id.* at 116. According to Judge Wiese, "this court cannot accept the rationale set forth in *Standard Manufacturing*. Government requests for information and responses from prospective bidders are not the equivalents of offer and acceptance. Such exchanges are not carried on with an expectation to presently affect legal relations." *Motorola*, 988 F.2d at 116.

According to Judge Wiese's opinion—adopted in its entirety by the Federal Circuit—the reason that Motorola's informal dialogue did not result in an implied-in-fact contract was that Motorola's exchange of information with the government was "not carried on with an expectation to presently affect legal relations. Rather the parties [were] dealing ... exclusively with an eye to the future, each being free, in the meantime, to withdraw from the dialogue." *Id.* at 116. In a passage that was extensively quoted by the Federal Circuit, Judge Wiese further explained why a formal bid is required to create an implied-in-fact contract. Once a bid is submitted to the government,

there is a promise ... which empowers the Government, upon acceptance, to bind the contractor to the terms of the solicitation. The essence of the contractor's engagement—the manifestation of an intent to be bound—warrants reading into the situation a reciprocal commitment from the Government, *i.e.,* a promise to fairly and honestly consider the contractor's bid.

*Id.* at 114 (quoting *Motorola, Inc. v. United States,* No. 92–799C (Ct.Fed.Cl. Dec. 23, 1992) (Wiese, J.))

The Federal Circuit's explicit reference to the language quoted above makes clear the nature and scope of that court's decision—namely that "a contractor's mere participation in a solicitation (by submitting information *or a proposal other than a formal responsive bid*) does not give the contractor standing to invoke this court's bid protest jurisdiction." *Control Data Sys., Inc. v. United States,* 32 Fed.Cl. 520, 524 (1994) (citing *Motorola,* 988 F.2d at 114, 116) (emphasis added). In other words, *Motorola* implicitly overruled *Standard* and *Magnavox* to the extent those cases held that anything less than a formal responsive bid can give rise to an implied-in-fact contract of fair and honest dealing that would permit this court to exercise its equitable jurisdiction. *See Motorola,* 988 F.2d at 116; *Control Data,* 32 Fed.Cl. at 524.

In the present case, the proposal submitted to the SEC by Garchik and the other plaintiffs was not a formal responsive "bid." In fact, formal bids were never solicited by the SEC. Rather, the CBD Notice explicitly stated that "[t]his notice of intent *is not intended as a request for competitive proposals."* (emphasis added). The plain language of the CBD Notice clearly forewarned Garchik and the other respondents that the SEC would not treat responses to the CBD Notice as formal bids. Garchik's submission to the SEC was not a bid, and therefore, under *Motorola,* there can be no implied-in-fact contract between Garchik and the SEC.

The conclusion that an implied-in-fact contract was not created by Garchik's response to the CBD Notice also conforms with the rationale of the *Motorola* decision. According to *Motorola,* a contractor's submission of

a responsive bid creates a power of acceptance in the government, an ability to bind the contractor upon acceptance. *See* 988 F.2d at 116. The implied-in-fact contract of fair and honest dealing is a "reciprocal commitment" that is imposed on the government in exchange for the contractor's promise to honor the bid. *Id.* In this case, the Commission's CBD Notice informed potential respondents that "[i]nformation received will be received *solely for the purpose of determining whether to conduct a competitive procurement."* (emphasis added). Under these terms, neither the government nor potential respondents such as Garchik were bound by their proposals. Since Garchik never manifested a present intent to be bound, there is no basis for imposing a "reciprocal commitment" on the SEC in the form of an implied-in-fact contract. Consequently, there is no basis for this court to exercise jurisdiction over Garchik's claim.

### B. Jurisdiction Based on the Court's Order in Triangle

■ Alternatively, plaintiffs argue that this court has jurisdiction over the present case by virtue of the court's order in *Triangle MLP Limited Partnership v. United States,* No. 95–430C, an earlier case before this court involving the SEC's attempts to procure a headquarters lease. In *Triangle,* this court issued an order dismissing the protest. As part of that order, the court stated that "should the Securities and Exchange Commission ("SEC") pursue obtaining *its short term minimum needs for a* headquarters facility, the SEC shall fully comply with all applicable statutes and regulations to ensure that these requirements are properly procured." *See Triangle,* No. 95–430C, "Order" entered on November 28, 1995. Plaintiffs now argue that this court's inherent power to enforce the *Triangle* Order provides a basis to exercise jurisdiction over plaintiffs' claims in the present case.

In support of this argument, plaintiffs have provided the court with language from two cases asserting the general proposition that a "court of competent jurisdiction has the power to make certain the execution of its decrees." *Chemical Leaman Tank Lines, Inc.*

*v. United States,* 446 F.Supp. 721, 724 (D.Del.1978) (quoted in Pls.' Opp'n at 10); *see also Sandlin v. Corporate Interiors Inc.,* 972 F.2d 1212, 1216 (10th Cir.1992) ("[T]hat a federal court of equity has jurisdiction of a bill ancillary to an original case or proceeding in the same court, whether at law or in equity, to secure or preserve the fruits and advantages of a judgment or decree rendered therein, is well settled.") (quoted in Pls. Opp'n at 9–10.) Plaintiffs' reliance on *Chemical Leaman* and *Sandlin* is misplaced, for neither case supports this court's exercise of jurisdiction over the present dispute. In fact, upon closer analysis these cases actually undermine plaintiffs' claim that this court has jurisdiction over this case by virtue of the *Triangle* Order.

In *Sandlin,* for example, the Court of Appeals rejected plaintiff/appellant's argument that the district court's enforcement of its judgment in a previous case served as a basis for the court to exercise jurisdiction over plaintiff's claims against a group of individuals who were not parties to the original action in which the judgment was entered. 972 F.2d at 1217. The court reasoned that plaintiff's claims against these individuals "d[id] not arise out of the same operative facts proved in securing the [prior] judgment; they involve different legal theories; [and] they are not against parties who were brought into the original ... action.... The district court would have to conduct a whole new trial or trials between nondiverse parties ... with recovery not necessarily measured by the amount of the [original] judgment." *Id.*

Similarly, in *Chemical Leaman* the court rejected plaintiff's argument that the court's enforcement of a previous order directed against the Interstate Commerce Commission ("ICC") formed a basis for exercising jurisdiction over plaintiff's renewed claims against the ICC. In rejecting plaintiff's argument, the court reasoned that "[t]he legal principles upon which [plaintiff's renewed] complaint is based are different from those upon which we relied [in issuing our previous order] ten years ago. And the record presently before this Court for review is a completely new one. In such circumstances, the

'continuing jurisdiction' rationale ... is not applicable." 446 F.Supp. at 724 (citations omitted). The court also observed that "[o]ur prior order disposed of all the issues then properly before us and remanded the case to the ICC for further proceedings. In our view, this effected a relinquishment to the Commission of our jurisdiction over the action. We find this conclusion to be bolstered by the absence in our [prior] opinion and order of any indication that we intended to retain jurisdiction over this controversy." 446 F.Supp. at 724 (citations omitted).

Neither *Sandlin* nor *Chemical Leaman* supports plaintiffs' argument that this court retains jurisdiction over the present case. In dismissing Triangle's protest, the court disposed of all issues then before it without specifically manifesting any intent to retain jurisdiction over the SEC's ongoing efforts to procure a headquarters lease. Therefore, this court relinquished jurisdiction over the matter when it entered the *Triangle* Order. *See Chemical Leaman,* 446 F.Supp. at 724. Furthermore, this court does not retain "continuing jurisdiction" over the present dispute because this case involves parties, issues of fact, and legal theories that were not before the court in *Triangle. See Sandlin,* 972 F.2d at 1217; *Chemical Leaman,* 446 F.Supp. at 724. First, the parties in the present case—Stephen Garchik, David Evans, The Evans Company, Stafford Place Associates, and Square 46 Associates—were not parties to the *Triangle* action. Similarly, the factual issues in the present case were not before the court in *Triangle.* Specifically, *Triangle* only concerned the events leading up to and including the SEC's decision to cancel the solicitation, while the present case concerns the sequence of events that occurred both before and after the SEC decided to cancel the SFO. Finally, the present case is based on legal theories that were not before the court in *Triangle.* In *Triangle,* the court was concerned with whether the Commission had complied with statutes and regulations governing competitive procurements; plaintiffs in the present case, however, are primarily challenging the Commission's subsequent efforts to conduct a sole-source procurement. As such, plaintiffs' present claim must be analyzed within an

entirely new legal framework. Consequently, this court does not retain "continuing jurisdiction" over the present case.

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted. Plaintiffs' submission of a proposal in response to the SEC's notice of intent to conduct a sole-source procurement did not create an implied-in-fact contract, and as a result this court lacks jurisdiction to consider the merits of plaintiffs' claim. In addition, this court's order in *Triangle* cannot serve as a basis for the court to exercise jurisdiction over the present dispute. The clerk shall dismiss the complaint. Costs for defendant.